THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
ARTURO RIVERA, Defendant-Appellant.

First District (5th Division)   No. 77-1786

Opinion filed May 18, 1979.

1028

Ackerman, Durkin & Egan, of Chicago (Thomas P. Durkin, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger and Wendy S. Paul, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE MEJDA delivered the opinion of the court:

Following a jury trial, defendant was found guilty of murder (Ill. Rev. Stat. 1973, ch. 38, par. 9—1) and was sentenced to a term of 30 to 60 years. On appeal defendant contends that: (1) the trial court erred in assuming that it had no authority to dismiss an indictment based on perjured testimony; (2) the court-appointed interpreter was incompetent and so closely connected with the prosecution that defendant was denied a fair trial; (3) the court erred in refusing a tendered instruction concerning an alibi defense; (4) the prosecutor's closing argument denied

defendant a fair trial; and (5) he was not proved guilty beyond a reasonable doubt. We affirm. The pertinent facts follow.

*Grand Jury*

The following proceedings were had before the grand jury which, on June 24, 1976, indicted defendant for murder.

Mesco Irizarry[1] testified that he attended a picnic with several Puerto Rican friends on June 20, 1976, at Caldwell Woods. While he was watching a band perform, there was a disturbance between his friends and members of another group. His friends attempted to leave but the others followed and hit a friend, "Husky," with a cane, cutting his ear. His friends ran back to their own group and told them what had happened. One of them known as "Pie" wanted to go back and get the people who had hit "Husky." After driving their girlfriends home they returned to the picnic area. "Pie" was talking to the people who had fought with "Husky." "Pie" pushed one of the others and as he turned, he was pushed to the ground. When "Pie" got up, he drew a gun and fired five shots at the other group. He then got into a car and left with the others. The witness knew the gunman only as "Pie" and did not know his real name.

Robert Rodriguez testified. On June 20, 1976, "Pie" visited him at his home. "Pie" asked "Where is all the guys" and told Rodriguez to find them so "Pie" could get some guns and cars and get "some of those people." Rodriguez refused to return to the picnic with him. When "Pie" returned at about 9 p.m. he told Rodriguez that he had "shot this dude over there."

Ernest Porter testified through an interpreter.[2] On June 20, 1976, he was at Caldwell Woods. There was a group of about 600 Assyrians at the park. He was leaving the picnic when several people asked if he was Assyrian. When he replied that he was, they pushed him and swore at him. One of the group attempted to draw a gun but his friends tried to stop him. The person with the gun pushed one of Porter's friends and Porter pushed the gunman and then ran away. As he ran he heard shots and went to tell someone that his friend Edward had been shot.

Officer Clyde Craig, a Chicago police homicide investigator, testified. Concerning the shooting, he was informed by the Coroner's office that Edward Dinkha died of a gunshot wound to the head. He knew that Arturo Rivera's alias was "Pie" and conducted a lineup wherein the defendant was identified by a "Mr. Bouts."[3]

---

[1] It appears from later testimony that Mesco Irizarry is also known as Ismael Rosario. In later references, he will be referred to as Ismael Rosario.

[2] It appears from later testimony that Ernest Porter is apparently Hermiz Kbuoto.

[3] "Mr. Bouts" is apparently Hermiz Kbuoto.

*Pretrial Motions*

Prior to trial the defense made a motion to quash defendant's arrest and suppress any identification because of alleged improper police conduct. A hearing was held at which the following testimony was heard.

Judith Youmaran testified with the aid of an interpreter. On June 21, 1976, she viewed a lineup and identified the defendant. Her testimony did not reveal any impropriety by the police in conducting the lineup.

Robert Rodriguez testified. He was at Caldwell Woods on June 20, 1976. At about 1 or 2 a.m. on June 21, two policemen came to his house and woke him. They told him that they wanted him to come to the police station to identify one of the men who hurt a friend of his. After waiting at the station for about an hour, he was taken upstairs to a dark room. The police asked whether he knew a person named "Pie," and he responded that he did but he did not understand the relevance of the question. They then asked him whether he knew if "Pie" did it and told him, "We want you to say that he did it. Well, we just want to get you out of here, if you want to stay out of here, then you just tell them he did it and you go home and forget about everything that happened." At some point he was pulled by his hair, knocked off a chair and dragged by his neck. He was then handcuffed to a chair and left in the room overnight. About 8 a.m. the next day a policeman asked him if he was going to do what the police suggested, and he said "all right, all right, I will do it." He was then taken home.

William Youmaran testified with the aid of an interpreter. He was at Caldwell Woods on June 20, 1976, when Edward Dinkha was shot. He spoke to some policemen about 45 minutes after the shooting and later spoke to the Chicago Police at his home at about 1 a.m. He agreed to go to the police station. At about 6:15 a.m. he viewed a lineup and identified one of the men as the one who shot Dinkha. His testimony did not reveal any improper conduct by the police.

Hermiz Kbuoto testified through an interpreter. He saw Edward Dinkha get shot on June 20, 1976, and saw the man who shot him. At 10:15 a.m. the following morning he viewed a lineup and with the help of an interpreter identified defendant as the assailant.

The defendant testified. He was arrested at about 6 a.m. on June 21, 1976, and brought to the police station. No arrest warrant was shown to him. Once at the station, he was slapped a couple of times and then placed in a lineup. He was told to take spot number 3. Several people viewed the lineup and said it was "number 3."

Robert Smitka, an investigator for the Chicago Police Department, testified. On June 21, 1976, while investigating the shooting of Edward Dinkha, he spoke with John Rios at about 3:30 a.m. Rios stated that he had been injured by some people at Caldwell Woods the day before and that

he was taken to a hospital. He mentioned that he had been with Robert Rodriguez, Ismael Rosario and a person named "Pie." At about 4 or 4:15 a.m. Smitka spoke with Rodriguez who informed him that although he had been present when Rios was hurt, he was not at Caldwell Woods when the shooting occurred. He was at home several hours later when "Pie" stopped by. "Pie" told Rodriguez that after he dropped Rios off earlier, he and a few friends returned to the woods to find the Assyrians who hurt Rios. "Pie" found a few of the Assyrians at the entrance to the woods, got into a struggle with one of them and started shooting. He knew that he had hit one of the Assyrians. Officer Smitka stated that he did not, nor, to his knowledge, did any other investigator threaten, strike, or physically abuse Rodriguez in any way. At about 5 a.m. Officer Smitka spoke with Rosario. Rosario told Smitka that after Rios had been injured, he, "Pie" and several others returned to the woods in two cars. When they reached the entrance to the woods, "Pie" approached a group of people. An argument started and "Pie" was knocked down. Rosario saw "Pie" pull out a gun and start firing.

All three of those interviewed knew the assailant only as "Pie." Smitka then showed each of the three a book of photographs and all three identified a photograph of Arturo Rivera as the person they knew as "Pie." Smitka identified this person as the defendant. Smitka arrested defendant at about 6 a.m.

A statement made by Ismael Rosario was also received. It stated that he was harassed in the same manner as Rodriguez had been, and that he had lied before the grand jury.

At the close of the hearing, the court denied the motions to quash the arrest and suppress the identification.

Defendant also filed a motion to dismiss the indictment on the ground that two witnesses, Rodriguez and Rosario, perjured themselves before the grand jury. Defendant contended that they were forced to lie because of the alleged improper police practices already detailed. Without the testimony of these two witnesses, there was insufficient evidence upon which an indictment could be returned. The trial court noted that two other witnesses had testified before the grand jury and then denied the motion to dismiss the indictment.

Before any testimony was taken at trial, the defense objected to the use of the State-selected interpreter because she had reviewed testimony with the State's witnesses and spoke Arabic, a second language of the witnesses, and not Assyrian, their native tongue. The defense offered to locate a disinterested interpreter who could speak Assyrian and to split the cost with the State. Alternatively, the defense suggested several college professors who could act as interpreters. The State suggested that the present interpreter could be examined by *voir dire* to see whether she

was unbiased and would translate accurately. The court suggested that the defense could have their own interpreter present and that if translation problems arose at trial, a hearing out of the presence of the jury would settle any differences.

A *voir dire* of the prospective interpreter, Najah Abdallah, was conducted. She testified that she had spoken with several of the State's witnesses, in the presence of assistant state's attorneys, concerning the present case. They had reviewed the testimony of Judith and William Youmaran and Hermiz Kbuoto concerning the lineup procedure, the photographs, and the police reports. She spoke to the witnesses in Arabic and had no problem in communicating with them. She testified that "I feel like I am here to do my job. That is all."

On examination by the State, the interpreter stated that she would truly and accurately translate the testimony and take such an oath.

The court found that Ms. Abdallah would be a fair and impartial interpreter and she could be used at trial. The defense was assisted by Adly Hatour, their own interpreter, at trial.

*Trial*

At trial, the following pertinent testimony was adduced.

*For the State*

Aprin DeBaz testified. He was the pastor of St. Surgis Church which sponsored the picnic at Caldwell Woods on June 20, 1976. He left the picnic after Edward Dinkha was shot and administered the last rites to the victim at the hospital.

William Youmaran testified. On June 20, 1976, he and Hermiz Kbuoto arrived at Caldwell Woods at about 3 or 3:30 p.m. He left the picnic with his sister, Judith Youmaran, Hermiz Kbuoto and the deceased at about 6:30 or 6:45 p.m., while it was still daylight. As they approached their car, the witness saw six people standing beside two cars. He identified the defendant as the person who asked whether Youmaran was Assyrian. When he answered yes, the defendant approached them. Two of defendant's friends tried but were unable to hold him back. Defendant then began pushing and swearing at Youmaran's friend. Again, defendant's friends tried unsuccessfully to restrain him. Defendant drew a gun and Kbuoto said "He got gun," and then pushed the defendant to the ground. While on the ground, defendant fired one shot in the air and the Assyrians ran. As Youmaran looked back he saw defendant standing and firing the gun five or six times. He saw Edward Dinkha fall to the ground. The next day at about 6:30 a.m. he viewed a lineup at the police station and identified the defendant.

On cross-examination the witness stated that Dinkha was shot after

8 p.m. and that the sun had already set. When the shooting began, he ran away from the defendant but looked back and saw Dinkha fall. He returned in about seven minutes and the six people were gone as well as the two cars. About 45 minutes later the police arrived.

On redirect, the witness stated that it was still daylight at the time of the shooting and he could see the defendant's face. He identified the lineup photograph and again identified the defendant.

Hermiz Kbuoto testified with the aid of the interpreter. On June 20, 1976, he attended the picnic and was leaving with William and Judith Youmaran and Edward Dinkha. He corroborated William Youmaran's testimony and also identified the defendant as the assailant. After defendant had fired the gun, Kbuoto ran away following Edward Dinkha. He saw Dinkha fall to the ground and when he turned to look back he saw the defendant still firing the gun. It was still daylight when the shooting occurred. After speaking with the police, he went home. He viewed a lineup at about 10:30 a.m. the next day, where he identified the person in the third position, the defendant, as the attacker.

On cross-examination the witness stated that he had seen the in-court interpreter on several occasions prior to trial and had reviewed his testimony.

Officer Frank Radke of the Chicago Police Department testified. He was the homicide investigator assigned to the Dinkha case. On June 21, 1976, after informing defendant of his *Miranda* rights, he had two conversations with him, one before and one after a lineup. Prior to the lineup defendant told him that he was not at Caldwell Woods during the evening of June 20, 1976, but he did know of the shooting. After being informed that he had been identified in the lineup, he said that he didn't do the shooting, and that he had been with his girlfriend Margarita all day. However, he could not give her last name, address, phone number, or the name of any of her relatives. He also said that he had been at the woods on the day in question and had brought a gun but he had left it under a car seat.

On cross-examination the officer admitted that many of the facts just related were not included in his report although it is customary to write down responses to questioning. When he first saw defendant at about 6:15 a.m., he could smell alcohol on his breath but he was not intoxicated. His investigation also revealed that the shooting occurred at about 8:30 p.m.

Dr. Yuksel Konacki testified. He was the pathologist who performed an autopsy on Edward Dinkha's body. In his opinion Dinkha's death was caused by a bullet wound lacerating the brain.

Robert Smitka, a Chicago police investigator, testified. He conducted a lineup at 6:30 a.m. on June 21, 1976. Judith Youmaran and William

Youmaran identified the defendant as the attacker, although a Mr. Albazi was unable to identify anyone in the lineup, since he had not seen the shooting.

Judith Youmaran testified through the interpreter. Her testimony was substantially the same as William Youmaran's testimony. She identified the defendant in court. When the pushing between Kbuoto and Rivera began, her brother told her to get help. As she ran she heard five or six shots. The next day she identified the defendant in a lineup.

On cross-examination she admitted that she had spoken to the assistant state's attorneys with the interpreter on several occasions. In addition, she did not actually see the shooting as she was running away.

It was stipulated that: (1) defendant was born on October 27, 1957; (2) on June 20, 1976, the sun set at 8:28 p.m.; and (3) the atmospheric conditions were clear. The State then rested.

### For the Defense

Rosa Lopez testified. She was at one time defendant's girlfriend and he was the father of her son Hipolito. On June 20, 1976, she went to the Rivera home because defendant's grandmother had died in Puerto Rico. She arrived at about 3 or 3:30 p.m. and found defendant, his mother and sister, and Hipolito at home. Defendant was watching television. At about 5:30 or 6 p.m. her sister, Maria Lopez, arrived. Several other friends came over and began drinking with defendant. She stayed at the home until 11:30 p.m. or midnight, and defendant was at home for the entire period. When she left defendant was sleeping.

The defendant testified. On June 20, 1976, he went to Caldwell Woods at about 11 a.m. with two friends. They met several friends and were dancing. They left about 2 p.m. and went home, arriving at about 3 p.m. He was informed by his mother that his grandmother had died. Rosa and Maria Lopez also came over to the house. He remained at home the rest of the day, drinking with several friends. He went to bed at about 10 p.m. and slept until 6 a.m. when he was arrested. He was taken to the police station where he was slapped in the face and then taken to a lineup. The lineup was already formed and he was told to take spot number 3. Later, he was in a second lineup and tried to take spot number 1 but was told by the police to take number 3. He denied having any altercation at Caldwell Woods, confronting Hermiz Kbuoto, or shooting Edward Dinkha.

On cross-examination, the defendant testified that it was light when he arrived home. However, at the hearing on his pretrial motions, he had said that it was dark. In addition, although he had testified on direct that he went to bed at 10 p.m., he then testified that he did not go to bed at all.

Robert Rodriguez testified. On June 20, 1976, he arrived at the woods

with Hector Hernandez at about 1 p.m. He saw a fight in which Johnny Rios was hit with a cane and cut near his ear. He returned with Rios to their picnic area but their friends except Hernandez and Herman Rosario had left. He was dropped off at his home, while the others took Rios to the hospital.

Although he knew who the defendant was, he did not know his name. He had seen defendant at the picnic at about 1 p.m. Once back home he stayed home until he was taken by detectives to the police station about 2:30 a.m. After waiting for about an hour in a room, the police returned. An officer grabbed his hair and asked if he knew anything about a murder. When he told them he did not know about it, they knocked him off the chair. He was told that if he did not want to be charged with the murder, he should say Arturo Rivera did it. He was handcuffed until 11:30 a.m. when he was brought before the grand jury and testified that "Pie" had told him that he shot someone. However, at trial he said that he had been lying before the grand jury. In fact, he knew nothing about any shooting at Caldwell Woods, nor did he know Arturo Rivera as "Pie." Because he had lied before the grand jury, he wrote a letter to defendant's attorney hoping it would rectify the situation.

Norma Soto, defendant's mother, testified through the use of an interpreter. On June 20, 1976, her mother had died. Defendant came home at about 2 p.m. and Ms. Soto told him of the death. Defendant then called Rosa, his wife, and told her to come over. Rosa came over at about 3:30 p.m. and stayed until 11:30 p.m. or 12:30 a.m. During that time defendant was drinking and never left the house. He went to sleep at about 10:30 p.m. At about 6:30 or 7 a.m. her son and two of his friends were arrested.

Maria Lopez testified. On June 20, 1976, she went to the Rivera home at about 5 p.m. and saw defendant there. She left with her sister Rosa at about 11 or 11:30 p.m. Defendant was present for that entire period and was drinking. When she left defendant was asleep.

### State's Rebuttal Evidence

Investigator Robert Smitka testified regarding the interrogation of Robert Rodriguez. His testimony was consistent with his earlier testimony and he specifically denied any physical abuse of Robert Rodriguez.

Assistant State's Attorney Michael Helding testified. He had reviewed Robert Rodriguez' grand jury testimony with him in preparation for the trial of the instant case. He asked Rodriguez essentially the same questions from the transcript and received the same answers.

The State introduced a stipulation made by defendant's attorney and an assistant state's attorney at defendant's bond hearing held on December 15, 1976. There it was stipulated that if called Norma Soto

would testify that "presently [December 15, 1976] unbeknownst to the defendant his grandmother had passed away and she does not—she no longer resides in the Commonwealth of Puerto Rico."

*Defense Surrebuttal*

Harvey Bass testified. He was the attorney who appeared on behalf of Arturo Rivera on December 15, 1976. He did not speak to Norma Soto because she spoke only Spanish and he did not. He requested an interpreter but one was not brought to the courtroom. When he entered the aforementioned stipulation, he did not mean to say that defendant did not at that time know that his grandmother was dead. He simply intended to show that if defendant were released on bond, there was no reason to fear that he would go to his grandmother in Puerto Rico. Mr. Bass knew at that time that the grandmother had died on June 20, 1976, and had discussed it with the defendant.

During the instruction conference, the defense offered an instruction on alibi defense which the court refused.

Following closing arguments, the jury retired. After some time the jury sent the following note to the courtroom:

"Question?

1) At what time of day and on what date did the Grandmother die?

2) By what means was Mrs. Soto notified?

3) When was message sent from P.R.?

4) What is the time difference between P.R. and Chicago?"

The court responded by saying:

"You must base your verdict on the evidence and instructions you have received."

The jury returned a verdict finding defendant guilty of murder and judgment was entered on this verdict. It is from this judgment that defendant appeals.

Opinion

I.

Defendant contends that the trial court erred in assuming that it had no authority to dismiss the indictment because of the allegedly perjured testimony since this was not one of the statutory grounds for dismissal listed in section 114—1 of the Code of Criminal Procedure of 1963. (Ill. Rev. Stat. 1977, ch. 38, par. 114—1.) He claims that the testimony of Ismael Rosario and Robert Rodriguez was coerced by the physical and psychological abuse of the police and that the return of an indictment based on this evidence constituted a violation of due process. Further,

that the trial court had inherent discretion to dismiss the indictment and the court's unawareness of this discretion requires a remand for a hearing on the merits of the alleged due process violation.

■■ A trial court has inherent authority to dismiss an indictment on the basis of a due process violation even though it is not one of the grounds listed in section 114—1. (*People v. Lawson* (1977), 67 Ill. 2d 449, 367 N.E.2d 1244.) Relying on *People v. Queen* (1974), 56 Ill. 2d 560, 310 N.E.2d 166, defendant claims that the trial court's erroneous belief that it had no discretion to dismiss the indictment was error which requires remandment for a hearing.

Contrary to defendant's claim, the following comments clearly reveal that the trial court was aware of its discretion to dismiss the indictment:

"The Court has agreed the statutes, the case decisions have indicated in addition to the grounds set forth in Section 114, that if there is no evidence as to a given defendant, that obviously it was in error in returning of the indictment, that even though that is not listed as one of the legal reasons for dismissal under 114, Chapter 38, the Court would have and has, in fact, in the past, exercised that right to dismiss such a petition. In fact, it's been done by yours truly in this very courtroom.

However, you, by your argument and by your petition, have clearly indicated that there was testimony, that there was no reason for the Grand Jury to disbelieve that testimony at that time, and that under all the attendant circumstances, if I were to permit a collateral attack upon such an indictment, then indeed every indictment may be subject to attack on this very same basis.

I am unaware of any law in the State of Illinois that would so provide and I am very hesitant to open up the door to further delays to getting to the substantive issue as to whether or not a crime was committed and if, in fact, a crime was committed and that this particular defendant in this case, Rivera, committed that crime.

Under all the attendant circumstances, without giving chance to the State to argue, it's my understanding of the law and I would therefore abide thereby, and I would dismiss and deny your petition forthwith on the basis there is no statutory or case decision therefor."

■■ Defendant complains that the trial court did not review the grand jury testimony before ruling on the petition to dismiss the indictment. The court was correct in its refusal to re-examine the testimony. "An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to

call for trial of the charge on the merits." (*Costello v. United States* (1956), 350 U.S. 359, 363, 100 L. Ed. 397, 402-03, 76 S. Ct. 406, 409.) Our supreme court discouraged the review of grand jury testimony in *People v. Jones* (1960), 19 Ill. 2d 37, 166 N.E.2d 1, saying:

"The delay is great when an accused can assail an indictment on this ground and cause the trial court to review all the evidence presented to the grand jury, as was done in this case. Such procedure adds nothing to the assurance of a fair trial to which the accused is entitled. We are of the opinion that the trial court should not inquire into the adequacy and competency of the evidence before the grand jury.

In conclusion, we hold that it is neither necessary nor proper, in ruling upon a motion to quash an indictment, to consider the evidence before the grand jury." 19 Ill. 2d 37, 43.

This position was reaffirmed in *People v. Creque* (1978), 72 Ill. 2d 515, 382 N.E.2d 793, where the court said:

"A defendant may not challenge an indictment on the ground that it is not supported by adequate evidence. (*People v. Jones* (1960), 19 Ill. 2d 37.) Guilt or innocence is to be determined at trial." 72 Ill. 2d 515, 527.

■ We do not doubt that a court could properly dismiss an indictment based upon perjured testimony if the denial of due process was established "with certainty." (*People v. Lawson* (1977), 67 Ill. 2d 449, 457, 367 N.E.2d 1244.) However, this is not such a case. The allegations of police misconduct were made at the full hearing to quash the arrest and suppress identification of defendant. The court was fully aware of defendant's claims. The alleged coercion was denied by the police officers, thus failing to establish the due process violation with certainty. In addition, two other witnesses testified before the grand jury, one eyewitness who identified defendant at a lineup and a police officer who was present at the lineup. In such a case, it would be improper to remand for a hearing absent a clear showing of a denial of due process. The trial court was aware of its inherent discretion to dismiss the indictment and properly refused to do so.

## II.

Defendant contends that the interpreter who translated for two of the eyewitnesses at trial was incompetent and so closely connected with the prosecution that defendant was denied a fair trial. He points out that the interpreter had been used to prepare the State's witnesses for trial and that she had to communicate with the witnesses in Arabic, their second language. Defendant cites frequent use of the third person rather than the first person and one instance where the interpreter apparently answered a

question directly as showing an inability to translate literally and a general incompetence. Defendant claims he was thereby denied his right to effective cross-examination. Finally, defendant suggests that the defense offer to procure a professional interpreter or a college professor was rejected because of the high costs involved and because the State wanted an interpreter who was familiar with the case, since this would facilitate paraphrasing and characterizations of the testimony rather than exact translations.

The calling of an interpreter is within the discretion of the trial court. (*People v. Soldat* (1965), 32 Ill. 2d 478, 207 N.E.2d 449; *People v. Shok* (1957), 12 Ill. 2d 93, 145 N.E.2d 86.) Where an abuse of that discretion deprives defendant of a basic right, a conviction will be reversed. *People v. Murphy* (1961), 21 Ill. 2d 149, 171 N.E.2d 618, *cert. denied* (1961), 368 U.S. 847, 7 L. Ed. 2d 44, 82 S. Ct. 76; *People v. Starling* (1974), 21 Ill. App. 3d 217, 315 N.E.2d 163.

Defendant first claims the incompetence of the interpreter denied him a fair trial. The central question is: Was the testimony, as presented through the interpreter, understandable, comprehensible, and intelligible, and if not, did that fact deny defendant his rights? (*People v. Starling.*) A review of the record reveals several isolated instances of the witnesses having difficulty with questions; however, on the whole, the testimony was understandable and comprehensible. The witnesses appear to have had no problem communicating through the use of their second language. The fact that the interpreter frequently referred to the witness in the third person and at one point appeared to testify herself did not show an inability to translate or a general incompetence, but a natural tendency to refer to the source of the quote.

Defendant was assisted at trial by his own interpreter. When asked whether their interpreter had any corrections to the translation, defense counsel responded, "There are some, there are some." However, he did not raise any specific objections at trial or on appeal except for the use of the third person. No inability to translate accurately or any general incompetence has been established. We therefore find that defendant was not denied his right to cross-examine the witnesses.

Defendant also contends that use of the interpreter who had prepared the prosecution witnesses denied him a fair trial since the interpreter was too closely connected with the State to be unbiased, and her familiarity with the evidence allowed her to paraphrase and characterize testimony rather than to translate literally. He cites *People v. Allen* (1974), 22 Ill. App. 3d 800, 317 N.E.2d 633, as support for this contention. In that case, defendant's conviction was reversed and the cause remanded for a new trial because the interpreter had translated the witness' initial statement to the police and testimony at trial indicated his possible involvement in the

events in question. Because of these facts it would be quite possible that the interpreter in *Allen* was biased.

In the instant case, the trial court attempted to avoid any possible prejudice or unfairness to defendant. Before allowing Ms. Abdallah to serve as interpreter, the trial court satisfied itself that she would be a fair and impartial interpreter. She was not shown to have any interest in the trial nor was she acquainted with any of the witnesses or defendant before the preparation for trial. She had no motive to change the testimony of witnesses as the interpreter may have had in *Allen*. Once again, the failure of the defense interpreter to object suggests that the translation was accurate and not a paraphrase of the testimony.

■■ ■ Finally, the interpreter was not so closely connected with the prosecution to deny defendant a fair trial. Use of a state's attorney's policeman as an interpreter has been held not improper (*People v. Torres* (1974), 18 Ill. App. 3d 921, 310 N.E.2d 780), nor was a police officer disqualified. (*People v. Murphy* (1916), 276 Ill. 304, 114 N.E. 609.) Ms. Abdallah was not associated with law enforcement and her use before trial to prepare the witnesses was a necessary part of trial preparation. This would not prevent her from being an unbiased interpreter at trial.

■■ It does not appear that the cost of another interpreter was the basis for the trial court's selection of Ms. Abdallah. The court was satisfied that she would be fair and impartial and her selection was not an abuse of the court's discretion. Since defendant has not established a denial of his rights through an abuse of discretion, his conviction will not be reversed on this ground.

## III.

■■ Defendant contends that the trial court erred in refusing his tendered instruction regarding alibi since he is entitled to have the jury instructed on a legally recognized defense theory to avoid any misunderstanding of his defense. He urges that the note which the jury sent out during deliberation showed the serious consideration the jury gave his strong alibi, and that if instructed on alibi the result may have been different. This contention has been consistently rejected. (*People v. Poe* (1971), 48 Ill. 2d 506, 272 N.E.2d 28, *cert. denied* (1971), 404 U.S. 942, 30 L. Ed. 2d 256, 92 S. Ct. 292; *People v. Coleman* (1977), 50 Ill. App. 3d 40, 365 N.E.2d 246; *People v. Sumner* (1976), 40 Ill. App. 3d 832, 354 N.E.2d 18.) Alibi is not an affirmative defense but is a method of countering the prosecution's case. (*People v. Pearson* (1960), 19 Ill. 2d 609, 169 N.E.2d 252.) The committee note to Illinois Pattern Jury Instructions, Criminal, No. 24.05 (1968), recommends that no instruction on alibi be given based on the policy of the Committee that instructions should avoid commenting on particular types of evidence. Contrary to defendant's suggestion,

the note from the jury demonstrates that they understood and considered his alibi defense and that an instruction was unnecessary. The trial court's refusal to give the tendered alibi instruction was not error. *People v. Poe.*

## IV.

■■ ■ Defendant cites 12 instances of allegedly improper comment made by the prosecutor in his closing argument. He concedes that while his objections to several of the comments were sustained, the prejudice caused by the frequent and continuous misconduct of the prosecutor was not removed from the minds of the jurors. Relying on *People v. Weathers* (1975), 62 Ill. 2d 114, 338 N.E.2d 880, he seeks reversal of his conviction and a new trial. "Each case of this kind must be decided upon its own facts." (*People v. Weathers*, at 120.) We have reviewed the comments and the context in which each of them was made. The most serious misconduct was a statement that defendant lied to the jury and to his own attorney. The comments were not persistent or so prejudicial as to deprive defendant of a fair trial. In view of the testimony of the three eyewitnesses, and the other clear and convincing evidence of guilt, we are unable to say that the remarks may have influenced the result, or that the verdict could have been otherwise had the remarks not been made. (*People v. Naujokas* (1962), 25 Ill. 2d 32, 182 N.E.2d 700.) Since the improper remarks did not constitute a material factor in the conviction, the verdict of guilty will not be disturbed. *People v. Fields* (1974), 59 Ill. 2d 516, 322 N.E.2d 33, *cert. denied* (1975), 423 U.S. 843, 46 L. Ed. 2d 65, 96 S. Ct. 80.

## V.

■■ Defendant's final contention is that he was not proved guilty beyond a reasonable doubt in view of the alibi evidence he offered. He relies on the fact that four witnesses testified that he was at home when the crime occurred. He also claims that this evidence overcomes the inadequate identification of the occurrence witnesses, who were unable to recall significant details which would support their identification. The trier of fact is not obligated to believe alibi testimony over that positively identifying the accused even where the alibi testimony is given by the greater number of witnesses. (*People v. Setzke* (1961), 22 Ill. 2d 582, 177 N.E. 2d 168; *People v. Bolden* (1978), 59 Ill. App. 3d 441, 375 N.E.2d 898.) A positive identification by a single witness with ample opportunity to observe is sufficient to support a conviction. (*People v. Williams* (1975), 60 Ill. 2d 1, 322 N.E.2d 819; *People v. Clarke* (1971), 50 Ill. 2d 104, 277 N.E.2d 866.) In the present case, three witnesses positively identified defendant both at a lineup and at trial. Defendant does not point to any specific inconsistencies as casting doubt on the identification testimony.

The weight and sufficiency of the evidence and credibility of the witnesses is for determination by the trier of fact (*People v. Akis* (1976), 63 Ill. 2d 296, 347 N.E.2d 733) and that determination will not be reversed unless the evidence is so improbable as to create a reasonable doubt of defendant's guilt. (*People v. Yarbrough* (1977), 67 Ill. 2d 222, 367 N.E.2d 666; *People v. Stringer* (1972), 52 Ill. 2d 564, 289 N.E.2d 631.) The evidence presented by this record does not raise a reasonable doubt as to defendant's guilt.

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

SULLIVAN, P. J., and WILSON, J., concur.