THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
WILLIAM HANNA, Defendant-Appellant.

Second District   No. 82—360

Opinion filed December 20, 1983.

Leavitt & Schneider, of Chicago, for appellant.

Fred Foreman, State's Attorney, of Waukegan (Phyllis J. Perko and Marshall Stevens, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE UNVERZAGT delivered the opinion of the court:

The defendant, William Hanna, was indicted in Lake County for two counts of murder as the result of the September 11, 1981, shooting of Richard Wells. (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(a)(1), (2).) He was found guilty by a jury and sentenced to 40 years in the Department of Corrections. He appealed.

The evidence showed the victim, Richard Wells, was shot while sitting in his car which was parked in front of 2214 Kristan Street in North Chicago. Several witnesses testified they observed the defendant approach the car on the driver's side. Just before the defendant approached the car, there was testimony he was seen handling two pistols, a .25-caliber automatic and a .38-caliber derringer. After the defendant approached the car a shot was heard, and the defendant was observed moving from the car toward the yard of 2214 Kristan. One witness said he saw a "shiny" object in the defendant's hand when he turned away from the car.

Transcripts of tape-recorded statements made by the defendant to investigating officers Zorzy and Millimaki on the date of the shooting were played to the jury while it viewed copies of the transcripts. In the statements, the defendant's version of the event was that he asked "Rick-eye," the victim, Richard Wells, for a ride home. "Rick-eye" agreed to do so for a dollar to cover the cost of gas. The defendant did not realize it was a four-door car, so he reached in, in back of the driver's seat, to push it forward. At that time, there was a shot, and the defendant stated he believed the bullet passed through his hair. He dropped to the ground, and got up and began to run behind

the house at 2214 Kristan. There was conflicting testimony as to who said: "No! That's the way they went," whereupon the defendant turned and ran back to the Tee Pee Liquor Store which was across the street and beyond a vacant lot from 2214 Kristin. When the police arrived at the scene, they took two of the witnesses to the occurrence, Waymon Callahan, who resided at 2214 Kristan, and the defendant to the station for questioning.

Callahan testified at trial that he saw the defendant later that afternoon at which time he went with the defendant to the back of Callahan's house where the defendant dug two pistols out of the gravel. The defendant told him to take them into the house, where he hid them under a chair for about an hour and a half. The guns were picked up by the defendant and Ralph Peterson, his nephew. Callahan's credibility was impeached during cross-examination when he testified he was a heavy drinker and admitted that he had previously told the police a lie concerning the shooting. He had told the police that the defendant did fall to the ground, that he thought the defendant had been shot, and that he had "seen three guys running across the house in the back of the alley on Kristan." Callahan denied that any of his numerous traffic citations had been dismissed in return for his testimony in the instant case.

Another witness, Barbara Lynch, observed the defendant in back of 2214 near some rocks just after the shooting. When she first saw him, he was getting up. After he got up, he ran south, past the garage behind 2214 Kristan into the alleyway toward a fence. As he ran, he said "Someone call the police. Someone shooted [sic] at me." She did not see anything in his hands, nor did she see him burying or discarding anything. She admitted on cross-examination she had stated in a prior conversation with the assistant State's Attorney that at the time she saw the defendant, he was touching his head, as if looking for a wound.

One of the witnesses who had seen the defendant with the two pistols about a half hour before the shooting, testified he was talking with two other men in the vicinity of the driver's side of the car in which the victim was seated, when he heard a shot fired from the direction of the car. He admitted he could not see between the buildings behind him, but he did not see anyone else near the car except the defendant. After the shot, he looked up at the car and saw the defendant's hands in his pockets. He saw the defendant walking toward the bushes, looking around. He did not see a gun in the defendant's hands and he did not see the defendant on the ground.

The issues raised by the defendant are:

I. Whether the court erred in denying defendant's motion for a mistrial or a continuance due to the State's alleged discovery violation in failing to provide the defendant with the names of rebuttal witnesses.

II. Whether the court erred in barring the testimony of R. A. Steindler as an expert witness.

III. Whether the court erred in limiting the cross-examination of certain State witnesses.

IV. Whether the defendant was proved guilty beyond a reasonable doubt.

## I. Discovery Violation

The defendant argues the court erred when it denied his motion for a mistrial or continuance. The motion was made due to the State's failure to disclose the existence of witnesses who would rebut the qualifications of his expert firearms witness, R. A. Steindler. The defendant argues that the nondisclosure of the existence of the rebuttal witnesses was a violation of *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194, which held that evidence material to the guilt or innocence of a defendant is subject to disclosure prior to trial. The defendant claims the court's error in denying a mistrial or continuance denied him due process as guaranteed by the fifth and fourteenth amendments. U.S. Const., amends. V, XIV.

The State responds that no discovery violation occurred because it has no obligation to disclose witnesses until it "forms the intention to call them." The State argues that until Steindler testified, it could not have known whether it needed to present rebuttal witnesses and, if so, which ones. Additionally, the State points out the error, if any, in failing to disclose the existence of witnesses was harmless. Rebuttal witnesses were never called to testify, and substantially the same evidence to which Steindler would have testified was testified to by another defense expert witness, Dr. DiMaio. Thus, the State posits the defendant has failed to show that he was prejudiced by virtue of its alleged discovery violation. Further, the State argues, correctly so, that no *Brady* violation occurred because the proposed testimony of the rebuttal witnesses would not have been favorable to the accused, and is not the type required to be disclosed to the defendant under *Brady*. Finally, the State points out the Illinois Supreme Court in *People v. Cornille* (1983), 95 Ill. 2d 497, 514, stated: "[E]very party *** has an obligation to verify the credentials of its expert witnesses." Accordingly, the State asserts

the defendant cannot now complain that he was prejudiced because he failed to do that which the State did do.

The defendant replies that it is evident the State formed its intent to call the rebuttal witnesses well in advance of trial since it had subpoenaed numerous rebuttal witnesses from different parts of the country. The defendant disagrees that Dr. DiMaio's testimony cured any prejudice to the defendant caused by the disqualification of Steindler, since DiMaio's "sole purpose" was to detail the medical effects of a distant gunshot vis-a-vis a contact shot upon the human body. Steindler's expected testimony, on the other hand—according to the defendant's offer of proof at trial—was that the bullet passed through an intermediate target and that "the target left an impression on the—nose of the bullet—the fragment that was recovered."

Lastly, the defendant asserts that notwithstanding his duty to verify the credentials of his expert witness, the State's failure to properly respond to the appropriate discovery orders, in effect, assisted Steindler in perpetrating a fraud upon the court.

> "The reciprocal rules of discovery in criminal cases require the disclosure to the accused of those persons whom the prosecutor intends to call as witnesses. The critical element is the prosecutor's intent, and until the prosecutor forms the intent to call a person as a witness there need be no disclosure, no matter how critical that person's testimony is." (*People v. Hine* (1980), 89 Ill. App. 3d 266, 267.)

Supreme Court Rule 412(a) requires the State to disclose to the defendant the names, addresses and substance of the testimony of witnesses it intends to call to rebut the defenses it has been advised the defendant intends to make, which disclosure is required to be made by the defendant to the State under Supreme Court Rule 413(d). (87 Ill. 2d Rules 412(a), 413(d).) Nevertheless, the State's intent to call the witness is still the critical element. *People v. Stinson* (1976), 37 Ill. App. 3d 229, 234; *People v. Manley* (1974), 19 Ill. App. 3d 365, 371.

The State's position here, of course, is that it could not have formed the intent to call the witnesses until Steindler testified at trial and became subject to impeachment. The defendant counters the State's intent to call these witnesses "to discredit Steindler's testimony and credentials as an expert" was formed well in advance of trial. The defendant points to the fact the witnesses had been brought in from various parts of the country, that the State used certain documentation from Cornell which was dated January 29, 1982 (about two months prior to trial) during its cross-examination

of the witness, and that the State had been furnished Steindler's *curriculum vitae* and a summary of his proposed testimony on March 1, 1982.

Neither party in this appeal squarely addresses the question whether the witnesses the State failed to disclose were indeed "rebuttal witnesses" required to be disclosed to the defendant under Supreme Court Rule 412(a).

Rebuttal evidence has been defined as that which is adduced by the prosecutor to explain, repeal, contradict, or disprove evidence given by the defendant. (*People v. Carbona* (1975), 27 Ill. App. 3d 988, *cert. denied* (1976), 424 U.S. 914, 47 L. Ed. 2d 319, 96 S. Ct. 1114; *People v. Bush* (1981), 103 Ill. App. 3d 5, 14.) In the case at bar, no evidence had yet been offered by the defendant; the defendant had proceeded no farther than the qualifying of his expert witness. It is well established that before an expert witness may give an opinion on the facts of the case, opposing counsel has a right to preliminary cross-examination to determine the adequacy of the expert's qualifications. (*People v. Sawhill* (1921), 299 Ill. 393; *Geving v. Fitzpatrick* (1978), 56 Ill. App. 3d 206, 211-12.) The prosecutor here obviously had checked Steindler's qualifications based on his *curriculum vitae* submitted prior to trial. He found the witness' qualifications unacceptable, and his preliminary questions to Steindler on cross-examination properly allowed Steindler an opportunity to explain what the State must have felt were discrepancies or misrepresentations. *Cf. Smith v. Ford* (1976), 43 Ill. App. 3d 407 (impeachment must be preceded by calling the attention of the witness to be impeached to the alleged omissions and giving such witness the opportunity to explain).

Further, it has been held to be error for the prosecutor to ask a defense witness a question designed to lay a foundation for an impeachment unless he is prepared to follow up a denial of the question with proof of the inference contained in the question. (*People v. Burbank* (1972), 53 Ill. 2d 261, 269-70; *People v. Wallenberg* (1962), 24 Ill. 2d 350; *People v. Woodburn* (1979), 75 Ill. App. 3d 532, 536; see generally *People v. Nuccio* (1969), 43 Ill. 2d 375.) The sole purpose of the witnesses secured by the prosecutor here was to provide proof of the inferences raised during his preliminary cross-examination of Steindler in the event Steindler denied those inferences.

■ In our opinion, these impeachment witnesses were not required to be disclosed to opposing counsel under the reciprocal discovery provisions of Supreme Court Rules 412(a) and 413(d). As pointed out by the State, every party has an obligation to verify the

credentials of its expert witnesses. (*People v. Cornille* (1983), 95 Ill. 2d 497, 514.) The record here quite clearly shows defense counsel did not verify Steindler's credentials but, rather, accepted that he was an expert because his services were purchased through an agency which caters to attorneys, the Technical Advisory Service for Attorneys.

However, defense counsel was at least in as good, if not a better, position than the prosecutor to verify Steindler's credentials. The due process clause speaks to the balance of forces between the accused and his accuser. (*Wardius v. Oregon* (1973), 412 U.S. 470, 474, 37 L. Ed. 2d 82, 87, 93 S. Ct. 2208, 2212.) The reciprocal discovery rights discussed in *Wardius* and implemented in Supreme Court Rules 412(a) and 413(d) insure that fundamental fairness will be accorded to those accused by the more powerful and resourceful accuser, the State. However, in our opinion, the instant case was not an example of the "poker game secrecy" eschewed in *Wardius*. (412 U.S. 470, 475, 37 L. Ed. 2d 82, 88, 93 S. Ct. 2208, 2211-12.) Rather, the defendant here bet on his cards, the State called him, and won.

For this reason, we conclude that no discovery violation occurred, and the defendant was not denied due process.

## II. Disqualification Of The Witness

The defendant argues the State impeached Steindler's general character, not his credentials. The defendant asserts he properly qualified Steindler with respect to his skills, knowledge and experience in ballistics. Consequently, he contends it was an abuse of the court's discretion to disqualify an expert witness on the basis of such a general attack on credibility. The defendant also argues the court's disqualification of Steindler was premature without the court having first actually heard the testimony of the State's impeachment witnesses.

The State responds that Steindler was successfully impeached as to whether he had the skill, training and experience necessary to enable him to form an opinion which was "worthy of belief by a jury." The State also asserts this issue is moot and/or irrelevant since defense counsel refused an opportunity to rehabilitate Steindler, and declared he could no longer vouch for the credibility of his witness.

The defendant in reply characterizes the State's "worthy of belief by a jury" theory of admissibility as an illusion. Defendant argues that *People v. Cornille* (1983), 95 Ill. 2d 497, supports his view that an expert's testimony concerning his professional qualifications

only relates to the issue of credibility, and that, as he argued during trial, Steindler's testimony should have ben heard with a proper admonition as to weight, and there was no issue of the admissibility of Steindler's testimony.

■ We find the defendant's argument without merit. Purportedly objective opinion testimony by an expert witness may have considerable influence on the jury, and the rules for qualifying expert witnesses are designed to ensure that only genuine experts will offer it. (*People v. Cornille* (1983), 95 Ill. 2d 497, 514.) The burden of establishing the qualifications of an expert witness rests on the proponent of his testimony. (*People v. Park* (1978), 72 Ill. 2d 203, 209.) Whether that burden has been met is a matter within the discretion of the trial court, and its decision is subject to reversal only if there has been an abuse of that discretion. *People v. Free* (1983), 94 Ill. 2d 378, 410.

Although the expert witness' qualifications are one factor properly considered by the jury in weighing his testimony, those same qualifications establish the foundation—or lack of foundation—for the admissibility of the expert's testimony which must be determined by the court—not the jury—in the first place. Whether the witness is competent to give an expert opinion lies within the broad discretion of the trial court, and its decision may not be overturned on review absent a finding of clear and prejudicial error. (*People v. Lang* (1982), 106 Ill. App. 3d 808, 813; *People v. Einstein* (1982), 106 Ill. App. 3d 526, 534.) Further, the degree and manner of knowledge and experience required of an expert witness is directly related to the complexity of the subject matter and the corresponding likelihood of error by one insufficiently familiar with the subject matter. *People v. Park* (1978), 72 Ill. 2d 203.

Although specialized formal training is not necessary, and experience alone may qualify one as an expert (*People v. Wade* (1977), 51 Ill. App. 3d 721), the ability to draw fine distinctions between ballistics markings has been characterized as one science which requires more than limited experience; to-wit, it requires thorough and systematic study. *People v. Park* (1978), 72 Ill. 2d 203, 210-11; *People v. Fiorita* (1930), 339 Ill. 78, 89.

Based on our review of the record, no formal training in ballistics is evident. Referring to Steindler's resume, the prosecutor during cross-examination asked at which institutions Steindler took the various listed post-graduate courses. The subjects of the various post-graduate courses were not noted in the record, therefore, it is not known whether they related to ballistics. Steindler apparently had not included the names of the schools or the dates of study of the post-

graduate courses. A book he claims to have authored, "The Standard Directory of Proof Marks," was shown on its face to read "*** by Gerhardt Wernberger, translated by R. W. Steindler." Steindler acknowledged the Association of Firearms and Tool Mark Examiners is the only such association in the country, and admitted that he had been "kicked out" of that association. After stating on cross-examination that all the articles he had written were concerning firearms, Steindler admitted that the article "The Mountains Get Steeper and Steeper" was "designed to be a 'tune-up'—pre-tune-up for a hunting trip" in the mountains where the air seems "very rare," and "every breath is actually very difficult to take."

■ The record does show defense counsel himself appeared to acquiesce in the court's decision to disqualify Steindler, since he indicated at trial he thought the court had correctly done so and that he himself would not "use this man as a witness because [he (defense counsel)] was outraged by his conduct." Nevertheless, the issue was raised by the defendant in his post-trial motion. However, we believe the court's decision not to allow Steindler to testify should be affirmed because no abuse of discretion is evident.

In its discretion, the court could readily have deduced that a purportedly expert witness who has misrepresented the extent of his expertise with regard to easily verifiable facts may have done more than simply misrepresent the extent of his experience, which would be quite difficult to actually verify. Additionally, we find without merit defendant's argument that the court's decision was premature because it did not actually hear the testimony of the available impeachment witnesses. Defendant's posture at trial even before the State had an opportunity to present the witnesses was that the State had successfully impeached Steindler's credentials, and that defense counsel could no longer vouch for Steindler. In response to the prosecutor's inquiry whether the defendant would be requesting the presentation of the witnesses in court, defense counsel stated "Mr. Steindler will not go back on the witness stand," and that all he needed was a list of the witnesses' names, addresses, and phone numbers.

We conclude no reversal on the basis of this issue is warranted.

### III. Limitation Of Cross-examination

Defendant argues the court improperly limited his cross-examination of State witnesses Zorzy and Millimaki, two North Chicago police officers, regarding the shooting of the defendant on September 1 in which he lost his left eye. The defendant asserts the limitation prevented him from minimizing or negating the erroneous impression or

misconception implicit in the testimony of another of the State's witnesses, Shirley Green. Ms. Green had testified she was parked in front of the car in which the victim, Richard Wells, was shot. She testified to a conversation with the defendant before the shooting in which she told him she was sorry about his eye, and that he should take it easy. The defendant responded: "No, he messed up my face." Ms. Green did not ask the defendant to whom he was referring when he said "he." The defendant contends the jury was left with the erroneous impression that the defendant shot Wells in revenge, and that had he not been limited in cross-examining Zorzy and Millimaki, he would have been able to dispel that notion and clarify that the defendant held people other than Wells responsible for the shooting.

The defendant did not specifically raise this issue in his post-trial motion in the cross-examination context which he now argues. However, the State has not argued waiver and the points raised in his post-trial motion might inferentially be construed as raising this issue.

> " 'As a general rule the latitude to be allowed in cross-examination of witnesses rests largely in the discretion of the trial court. Such cross-examination should be kept within fair and reasonable limits, and it is only in a case of clear abuse of such discretion, resulting in manifest prejudice to the defendant, that a reviewing court will interfere.' [Citations.]" (*People v. Peter* (1973), 55 Ill. 2d 443, 451-52, *cert. denied* (1974), 417 U.S. 920, 41 L. Ed. 2d 225, 94 S. Ct. 2627.)

A trial court properly sustains an objection to cross-examination which is beyond the scope of direct examination and in which the defendant attempts to put this theory of the case before the jury. (*Bryntesen v. Carroll Construction Co.* (1963), 27 Ill. 2d 566, 569.) Further, objections to questions posed in improper form are properly sustained. (*People v. Rossini* (1962), 25 Ill. 2d 617, 621.) It is competent to develop all of the circumstances within the knowledge of a witness which qualify his direct testimony, even if, strictly speaking, the subject introduced is new and one which should be part of the cross-examiner's own case. *People v. Davis* (1974), 19 Ill. App. 3d 709, 715-16.

■ Both officers testified before Shirley Green related the conversation with the defendant. Defendant's question on cross-examination to Zorzy was entirely beyond the scope of direct, and the questions propounded to Millimaki related to matters beyond that officer's own knowledge. Additionally, defendant never questioned Shirley Green if she knew who the "he" was to whom the defendant was referring. Further, defendant has not shown any manifest prejudice to

him as the result of these rulings. Rather than present a witness named VanDien who would have been able to testify with regard to the shooting of the defendant, the defendant acquiesced in the State's offer to stipulate to the fact the defendant was shot on September 1, that an arrest warrant was issued, an individual was charged, and that there was a finding of no probable cause. That stipulation was read to the jury.

Although proof of motive is material and important in a case where the evidence of guilt is entirely circumstantial (*People v. Holtz* (1920), 294 Ill. 143), Green's testimony did not establish the defendant was talking about the victim when he said, "He messed up my face." Further, as pointed out by the State, the court's rulings only restricted the defendant from specifically naming either Eugene or Roosevelt Hall as the persons who attacked him on September 1. Such evidence, however, would not have negated the fact that the victim might also have been involved in the September 1 shooting of the defendant.

We conclude the court did not abuse its discretion in so limiting the defendant's cross-examination.

## IV. REASONABLE DOUBT

The defendant contends he was not proved guilty beyond a reasonable doubt. He asserts that the statement he made to the police concerning the incident was corroborated by the State's witnesses' testimony. Further, that conflicting expert evidence concerning the range at which the shot was fired, and the lack of eyewitnesses and motive show that the evidence did not exclude every other reasonable hypothesis of his innocence and, therefore, his guilt was not established. *People v. Garrett* (1975), 62 Ill. 2d 151; *People v. Wilson* (1948), 400 Ill. 461.

It has been held that a valid conviction may be based entirely on circumstantial evidence. (*People v. Williams* (1977), 66 Ill. 2d 478.) It is necessary, however, that the proof be of a conclusive nature leading, on the whole, to a reasonable and moral certainty that the accused and no one else committed the crime. *People v. Weaver* (1982), 92 Ill. 2d 545.

■ The evidence here supports the defendant's conviction. The defendant was seen prior to the shooting handling two pistols, one of which was a .38-caliber derringer. The fatal wound was inflicted by a .38-caliber weapon. Contrary to the defendant's statement to the police, two of the State's witnesses, Harvey Harden and Waymon Callahan, testified that after they heard the shot, the defendant did not fall

or drop down to the ground. Rather, Harden testified the defendant, standing at the open door of the driver's side of the car, crouched down, there was a shot, and the defendant turned around and walked away from the car. Harden saw a "shiny" object in the defendant's right hand.

Waymon Callahan, viewing the scene from the front of 2214 Kristan, his residence (a position which was on the passengers' side of the car), testified the defendant walked up to the car and was immediately adjacent to the driver's side of the car when the shot was heard. Callahan testified the sound of the shot came from the vicinity of the car, and that he saw the defendant run away from the car and into the yard of 2214 Kristan. Callahan's testimony was corroborated by another witness, Herbert Williams, Jr., who had approximately the same vantage point as Callahan. Williams testified that after he heard the shot, he saw the defendant look around, and then head for the front yard of 2214 Kristan.

Callahan testified that later in the afternoon of the day of the shooting, after he and the defendant gave their statements to the police, Callahan and the defendant dug up the two guns that he had seen the defendant with earlier that day. The guns were dug up from a gravel area located in the back of the house at 2214 Kristan close to the porch. The defendant told Callahan to wipe the guns off "really good." Callahan took the guns inside his house and hid them for an hour and a half, at which time the defendant and his nephew, Ralph Peterson, picked up the guns.

Barbara Lynch, who lived next door to the house at 2214 Kristan, testified that she heard a "firecracker noise," and saw the defendant in the back of 2214 Kristan. She testified that when she first saw him, he was getting up from the "rock patch."

The State's expert witnesses testified that the fatal wound was the result of a contact shot, and even the defendant's expert witness agreed that normally unburnt particles of gun powder would not be found in the wound track if the shot were a distant one. There was evidence that the stellate-shaped wound, although generally an indication of a contact wound, could have been caused by a tumbling bullet that had passed through an intermediate target.

The jury was the trier of fact here. As such, it was its prerogative to weigh the testimony in light of its discrepancies and conflicts, to accept or reject as much or as little of the witnesses' testimony as it pleased, and to draw reasonable inferences from that testimony. (*People v. Lutz* (1982), 103 Ill. App. 3d 976, 980-81.) The evidence in this case was not so unreasonable, improbable or unsatisfactory as to raise

a reasonable doubt of the defendant's guilt. Accordingly, the verdict is supported by the evidence, and the trial court's judgment may not be disturbed. *People v. Ellis* (1978), 74 Ill. 2d 489, 496.

The judgment of the circuit court of Lake County is affirmed.

Affirmed.

LINDBERG and NASH, JJ., concur.