THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROBERT JACKSON, Defendant-Appellant.

First District (1st Division)   No. 1—86—2297

Opinion filed December 16, 1991.

Randolph N. Stone, Public Defender, of Chicago (Richard E. Gade, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, David Stabrawa, and Solita L. Pandit, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CAMPBELL delivered the opinion of the court:

Following a jury trial, defendants, Robert Jackson, John Brandon and Michael Williams were convicted of the murder of Willie Ray Thompson on November 19, 1984. Brandon and Jackson were each sentenced to 35-year prison terms; Williams was sentenced to a 40-year prison term. John Brandon and Michael Williams are not parties to this appeal. The instant appeal is related to *People v. Brandon* (1990), 197 Ill. App. 3d 866, 557 N.E.2d 1264, where the issues raised on appeal by Brandon and Williams are addressed. On appeal, defendant contends that: (1) the trial court erred in denying defendant's motion for a mistrial on the ground that the unexpected testimony of a State's witness subpoenaed by codefendant would render codefendants' defenses antagonistic to his own defense; and (2) defendant was deprived of a fair trial when the trial court allowed a police officer to testify that an assistant State's Attorney approved the filing of mur-

der charges against him. For the following reasons, the judgment of the trial court is affirmed.

The record sets forth the following facts relevant to this appeal. Prior to trial, defendant and codefendant Brandon moved for severance from codefendant Williams based on the State's expressed intention to introduce evidence of Williams' attempted murder of John Bates, a key State's witness, while Williams was out on bail. The trial court granted severance. However, before trial commenced, Jackson and Brandon withdrew their motions for severance and the court vacated the severance orders.

At trial, John Bates testified on behalf of the State that at approximately 11 p.m. on November 19, 1984, he was standing in the lobby of the apartment building located at 1510 W. 13th Street when he heard gunshots and shooting outside. He looked out the front door of the building and saw Jackson and Brandon, both armed with guns, chasing Willie Ray Thompson and shooting at him.

Bates saw Thompson run to a nearby rowhouse at 1222 South Laflin, pound on the door and yell "Mrs. Crenshaw." Thompson broke one of the windows in Mrs. Crenshaw's rowhouse, then ran toward Roosevelt Road. Thompson slipped and fell while he was running, Jackson and Brandon caught up with him and the three struggled.

At that point, a car pulled up near the three men and Bates saw Williams get out of the car, walk over to Thompson, who was being held down by Jackson and Brandon, and shoot Thompson in the face. While Brandon and Jackson were still holding Thompson, Williams shook him, then fired additional shots into him at close range. Williams, Brandon and Jackson then entered Williams' car and drove away. Bates stated that a crowd gathered all around the area and that people were looking out of their windows. The police arrived a few minutes later, but Bates went home without talking to them.

The following day, November 20, Bates called the police to report the shooting and was referred to officers at a different headquarters. He then called Henry Wright, a friend who had also witnessed the shooting. On November 21, Bates called the police again to report that he had witnessed the shooting. The police picked him up and drove him to police headquarters where he identified photos of Jackson, Brandon and Williams, spoke to an assistant State's Attorney and testified before the grand jury. On November 22, Bates identified Jackson in a lineup and called Henry Wright to urge him to come to the police station.

Dr. Yuksel Konacki, Cook County medical examiner, testified that while performing the autopsy on the victim, he recovered two recent bullets from the head and that the wounds were from close range.

Ella May Crenshaw testified on behalf of the State that at approximately 11 p.m. on November 19, she heard someone pounding on her door and calling out her name. As she got up, she heard her window break and then heard shots. She fell to the floor and eventually crawled to the living room.

Chicago police detective Gerald Dorich testified that he interviewed Bates at Area 4 headquarters on November 21, and that Bates then talked to an assistant State's Attorney and later testified before a grand jury. Dorich stated that Bates then went before the Honorable Sophia Hall, where warrants for defendants' arrests were approved. On November 22, Bates identified Jackson in a lineup at Area 4 headquarters.

Herman Mollison testified on behalf of the State that on November 19, approximately 10:30 p.m., he was walking with Jeff Bradford and Thompson when they encountered Jackson. Jackson told them that he wanted to talk and pulled out a gun. The three men scattered and ran in different directions; Mollison and Bradford ran separately in a westerly direction, while Thompson ran in an easterly direction. Jackson ran after Thompson. Mollison then heard several shots. When Mollison and Bradford eventually met up with each other, they returned to the area where Jackson had confronted them and saw Thompson lying on the ground. On cross-examination, Mollison stated that he had been subpoenaed to appear at trial by counsel for defendant Williams.

Chicago police officers Lenti and Thomas testified on behalf of the State that at the time they arrived at the scene of the shooting, they spoke to three security guards who stated that they had seen some men running. Officer Thomas knocked on some doors, but stated that no one would say anything about the incident.

Next, Henry Wright, confined to a wheelchair as the result of having been shot, testified on behalf of the State that on November 19, approximately 11 p.m., he was walking to a liquor store when he saw Brandon standing in the fire lane near 1441 West 13th Street. Wright heard some shots and ducked behind a car. When he looked up, he saw Jackson and Brandon chasing Thompson. While Jackson was shooting at Thompson, Brandon attempted to cut Thompson off by running across the street. Thompson then ran to Mrs. Crenshaw's house. He saw Thompson pound on Mrs. Crenshaw's door and break one of her windows. Jackson and Brandon caught up with Thompson

and took him to the alley. At that point, a small car came down the street and stopped. Williams got out, walked across the street toward Jackson, Brandon and Thompson, and fired a gun in Thompson's face at close range. Williams then bent down, shook the victim, and fired twice more. Jackson, Brandon and Williams then walked toward the car, got in and drove away. Wright did not talk to anyone about the incident until he received a call from Bates. On November 22, 1984, Wright identified Jackson at police headquarters. On cross-examination, Wright stated that he believed that he had been shot as the result of his involvement with this case.

Following the State's case in chief, the defendants' individual motions for directed verdict were denied. Yvonne Moore and Alex Moore, husband and wife, gave alibi testimony on behalf of Brandon, that on November 19, Brandon dropped off his wife and son at their house at approximately 6 p.m. and returned to pick them up at approximately 10 p.m. Angela Brandon, Brandon's wife, substantiated the Moores' testimony, adding that they then picked up Brandon's mother at approximately 10:50 p.m., were home by 11 p.m., and Brandon went to bed and did not leave the house again that night. Lilian Brandon, Brandon's mother, testified as to the same chronology of events.

Ann Wilson, office manager of the Seville Motel, gave alibi testimony for Williams. Wilson identified a motel registration card in the name of Michael Williams, dated November 19, 1984, and time stamped 11:23 p.m.

Next, Gregory Lewis, Herman Smith and Curly Manon, security guards who had been working together in the area of the murder on the 4 p.m. to 12 a.m. shift on November 19, testified on behalf of defendants. Lewis stated that at approximately 11 p.m., they were checking vacant apartments on the twelfth floor of the building at 1433 W. 13th Street when they looked out of one of the windows and saw one man approach a group of three others on the ground below. Lewis testified that when the man approached the group, the three dispersed in different directions. He then heard a shot, and he and Smith ran down the stairwell and went outside. Once outside, they saw the victim and another person running toward a group of rowhouses. The victim beat on the window of one of the rowhouses, ran a little farther and either slipped or was knocked down. Lewis then heard another shot, saw a person run across the street and get into a car. Lewis and Smith walked over to where the victim was lying. Lewis did not see anyone else in the area while the incident was taking place.

Herman Smith, one of the security guards, testified to the same observation out of the twelfth-floor window. Smith ran down the stairwell with Lewis and saw one man chasing another near the rowhouses. One of the men broke a window. Smith then heard a shot, one man fell, and the other got into a car. There were not many people in the area before the shooting, but there were after it was over.

Following closing arguments and deliberations, the jury found all three defendants guilty of the murder of Thompson. After a hearing in aggravation and mitigation, the trial court sentenced Jackson and Brandon to terms of 35 years each and Williams to a prison term of 40 years. Defendant's timely appeal followed.

Defendant first contends that the testimony of a State's witness prejudiced him and thereby denied him a fair trial. Defendant argues that the testimony of Herman Mollison introduced an antagonistic defense to the trial which deprived him of his right to due process, and that Mollison's testimony exonerated codefendants Williams and Brandon, while inculpating defendant as the one person who shot Thompson. Mollison testified on behalf of the State that he had been walking with the victim when he was approached by defendant, who was armed, and that he ran off in one direction while defendant chased the victim in another direction. Mollison heard shots, but did not see the shooting. When he returned to the scene, the victim was dead.

Defendant also argues that Mollison's testimony was unexpected and that he was prejudiced by such unexpected testimony. The record discloses the following colloquy between the court and Mr. King, defendant's defense counsel:

"[MR. KING:] *** The witness that I believe Mr. Groark is going to call is a fellow named Mollison. The State struck him in the answer. *** Mr. Adam subpoenas in a witness whose purpose I believe is to exculpate his client at least and maybe this other fellow while in the meantime putting the blame on my client.

\* \* \*

[THE COURT:] He's not exculpating anybody else. He's a witness who had a limited view of something or some other event and he's going to testify to whatever view he had or saw or witnesses and that's all. He's not going to expand it or protract it.

[Mr. KING:] I don't want the State calling him because they have stricken him, he's not on their answer ***.

[THE COURT:] The striking is evidently now rescinded.

[MR. KING:] They have so made that motion. I wasn't aware of that.

[THE COURT:] No, they didn't but as long as nobody is shocked or surprised by the presence of this witness, there is no prejudice there.

[MR. KING:] I can't say I'm surprised at this point that's for sure."

In response, the State argues that defendant's defense was not antagonistic to the defenses of his codefendants. First, the State argues that defendant moved to vacate an order of severance from Williams which had been granted by the trial court. The State further argues that Mollison's name appeared on the State's witness list and therefore defendant was not surprised by Mollison's testimony.

Whether to grant a mistrial is within the broad discretion of the trial court (*Illinois v. Somerville* (1973), 410 U.S. 458, 462, 35 L. Ed. 2d 425, 429, 93 S. Ct. 1066, 1069; *People v. Robinson* (1984), 121 Ill. App. 3d 1003, 1014-15, 460 N.E.2d 392), and a mistrial should be declared only in cases where there is an occurrence of such character and magnitude as to deprive a party of a fair trial and the moving party demonstrates actual prejudice (*People v. Suane* (1987), 164 Ill. App. 3d 997, 518 N.E.2d 458).

Both defendant and the State rely on cases that are distinguishable on the facts in that they address whether the trial court erred in denying codefendants' pretrial motions for severance. Defendant relies on *People v. Jackson* (1986), 150 Ill. App. 3d 1, 501 N.E.2d 802, *People v. Threzzy* (1987), 163 Ill. App. 3d 180, 516 N.E.2d 573, *People v. Johnson* (1989), 187 Ill. App. 3d 756, 544 N.E.2d 392, and *People v. Gibons* (1986), 149 Ill. App. 3d 37, 500 N.E.2d 517. The State relies on *People v. Olinger* (1986), 112 Ill. 2d 324, 493 N.E.2d 579, and *People v. Byron* (1987), 116 Ill. 2d 81, 506 N.E.2d 1247. Reliance on these cases is misplaced because in each case, the trial court denied codefendants' severance motions. These cases do not address denial of mistrial.

Defendant's contention that *People v. Bean* (1985), 109 Ill. 2d 80, 485 N.E.2d 349, supports the granting of a mistrial in this case is unavailing. The *Bean* court held that where codefendants' motions for severance have been denied before trial, defendants may renew such motions during trial in the form of a motion for mistrial if defenses become antagonistic. In the present case, as in *Brandon*, the issue of whether severance was properly denied is not before this court. (*Brandon*, 197 Ill. App. 3d at 882.) As was previously stated, prior to trial, the trial court had granted defendant's motion to sever his trial

from that of Williams. Subsequently, defendant's motion to vacate the severance order was granted.

■ Moreover, defendant's argument that he was prejudiced by Mollison's testimony is unpersuasive. Mollison's testimony did not create antagonistic defenses because it did not inculpate Jackson while at the same time exculpating Williams and Brandon. As stated earlier, Brandon and Williams presented alibi defenses at trial, Brandon maintaining that he was home with his family, and Williams maintaining that he was in a motel at the time of the shooting. Defendant suffered no antagonism from codefendants' defenses because each codefendant attempted to establish an alibi defense which in no manner incriminated defendant, nor denied him a fair trial. See *People v. Blount* (1991), 220 Ill. App. 3d 732, 741.

It is true that the State has a duty to disclose all witnesses or potential witnesses to the defense (*People v. Hanna* (1983), 120 Ill. App. 3d 602, 457 N.E.2d 1352), and where the defendant has been surprised or prejudiced by the State's violation of discovery, this court has found that the trial court abused its discretion in allowing such testimony. *People v. Shiflet* (1984), 125 Ill. App. 3d 161, 180, 465 N.E.2d 942.

However, where there has been no surprise but rather the defendant has merely been unable to contact a State's witness, this court has held that no prejudice resulted. (*People v. Trice* (1991), 217 Ill. App. 3d 967, 981.) There, defense counsel moved to bar the testimony of a State's witness listed on its answer because he had not been able to contact the witness prior to trial. The court held that no surprise or prejudice resulted.

In the present case, the record indicates that defendant was not surprised by the proposed testimony of Mollison. Mollison's name appeared on the State's witness list. The record discloses that defense counsel had the opportunity to interview the witness prior to his testimony; however, Mollison refused to talk to him. For these reasons, we conclude that the trial court did not err in denying defendant's motion for mistrial.

Next, defendant argues that he was prejudiced when the trial court sustained objections to comments made by his own counsel in closing argument. During closing argument, defendant's counsel commented that Mollison was a friend of Williams and stated that Williams' defense counsel subpoenaed Mollison to distract the jury. The trial court sustained objections to the second statement, as facts not in evidence. Defendant's counsel subsequently made several references to Williams as the sole shooter. Counsel for Williams objected

numerous times, and the trial court sustained these objections. At one point the court admonished defense counsel:

"[THE COURT:] *** please argue the evidence as it relates to your client *** but refrain from comments about other defendants."

Counsel for Williams moved twice for a mistrial.

At the conclusion of defense counsel's argument, the court admonished the jury:

"[THE COURT:] The Court wishes to advise the Jury that it is not for one defendant to cast aspersions upon another. And insofar as Mr. King's argument contained aspersions cast by one Defense position upon another, that part of his argument, the Jury is instructed to disregard."

The State's response is that the trial court properly sustained objections to comments made by Jackson's counsel during closing argument. First, the State argues that the record is clear that the fact that codefendant Williams subpoenaed Mollison was not in evidence before the jury, and that the trial court properly sustained Williams' objections to defendant's conclusions. The State further argues that the court correctly admonished defendant's counsel to refrain from making comments about the other defendants. Finally, the State contends that even if defendant was somehow prejudiced, the instructions to the jury that closing arguments are not to be considered as evidence cured any possible error.

The determination as to the propriety of comments during closing argument is within the discretion of the trial court and will not be reversed on appeal absent a showing of abuse of discretion or substantial prejudice to defendant. (*People v. Trask* (1988), 167 Ill. App. 3d 694, 521 N.E.2d 1222; *People v. Neumann* (1986), 148 Ill. App. 3d 362, 499 N.E.2d 487.) Moreover, facts not in evidence cannot be argued in closing argument. *People v. Linscott* (1991), 142 Ill. 2d 22, 566 N.E.2d 1355; *People v. Carlson* (1982), 92 Ill. 2d 440, 442 N.E.2d 504.

■ Defendant complains about comments made by his own counsel during closing argument, which invited objection by counsel for codefendant Williams. We agree with the State that any error was harmless to defendant. In upholding the convictions of Brandon and Williams, we stated:

"Although the comments made by counsel for Jackson may have been improper, in light of the jury's verdict against all three defendants, [and] the trial court's instruction to the jury that it should disregard the comments made by counsel for

Jackson during closing argument *** we conclude that any possible error was harmless and does not provide grounds for reversal." *Brandon*, 197 Ill. App. 3d at 882, 557 N.E.2d at 1274.

■ Finally, defendant argues that the testimony of Detective Dorich placed an "imprimatur of guilt" upon Jackson by stating that the assistant State's Attorney had "approved the charge of murder" and that Judge Sophia Hall had signed the warrants. We addressed this issue in *Brandon*. The specific testimony to which Jackson objects is the same as that objected to in *Brandon*:

"[STATE:] What was done after John Bates went to the Grand Jury?

[DORICH:] [Assistant State's Attorney] Susan Fleming then approved for presentation to the Judge 3 warrants.

[STATE:] What were those warrants for?

[DORICH:] Each warrant was for murder.

[STATE:] Who?

[DORICH:] Michael Williams, John Brandon and Robert Jackson.

[STATE:] After those warrants were prepared, what happened?

[DORICH:] I took John Bates myself down to Judge Sophia A. Hall's courtroom and we both appeared before Judge Sophia Hall, she interviewed and talked to both of us and she signed or approved the warrant." *Brandon*, 197 Ill. App. 3d at 879.

In the present case, as in *Brandon*, defendant relies on *People v. Blissitt* (1973), 12 Ill. App. 3d 551, 299 N.E.2d 562, and *People v. Turner* (1984), 127 Ill. App. 3d 784, 469 N.E.2d 368. Defendant here also relies on *People v. Valdery* (1978), 65 Ill. App. 3d 375, 381 N.E.2d 1217.

In *Blissitt, Turner*, and *Valdery*, a prosecutor testified at trial that he had recommended that charges be placed against the respective defendant. The *Blissitt* court held that the testimony was improper and constituted prejudicial error on the ground that it was tantamount to a trial prosecutor offering his belief of a defendant's guilt to a jury. The *Turner* court found the prejudicial impact of the prosecutor's testimony in its case to have been even greater than that in *Blissitt* because the prosecutor testified that he had spoken to the police, to several witnesses and to defendant, plus he had waited for the medical examiner to release the results of an autopsy on the victim prior to recommending charges. In *Valdery*, the prosecutor made remarks as to his opinions of the integrity of the witnesses and his

personal beliefs in their testimony. The *Blissitt, Turner* and *Valdery* courts all remanded the cases for new trials.

As in *Brandon*, the State argues that defendant waived this issue for review by failing to object to specific testimony at trial or to raise the alleged error in the post-trial motion. (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124; *People v. Brandon* (1990), 197 Ill. App. 3d 866, 557 N.E.2d 1264.) In *Brandon*, we agreed with the State, but stated that even if the issue had not been waived, defendant Williams' argument was unpersuasive, as the authority on which he relied, namely *Blissett* and *Turner*, did not support his contention. We find the same to be true in the present case.

In the present case, a prosecutor did not testify, nor offer his own beliefs as to credibility of witnesses. Instead, Detective Dorich set forth the steps he had taken to procure arrest warrants. Further, Dorich never stated that either the assistant State's Attorney or the judge had recommended the charges. They merely approved the charges, a requisite step to procuring arrest warrants in any case. Therefore, Dorich's testimony did not prejudice Jackson.

For the aforementioned reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

BUCKLEY and O'CONNOR, JJ., concur.