THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHN BRANDON *et al.*, Defendants-Appellants.

First District (1st Division) Nos. 1—86—2220, 1—86—2224 cons.

Opinion filed April 23, 1990.—Rehearing denied June 21, 1990.

Michael J. Pelletier, Jeffrey A. Walker, and Leslie Wallin, all of State Appellate Defender's Office, and Sam Adam, both of Chicago, for appellants.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund, Maureen A. Harton, and Matthew E. Coghlan, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CAMPBELL delivered the opinion of the court:

This is a consolidated appeal. Following a jury trial, defendants John Brandon, Michael Williams and Robert Jackson were convicted of the murder of Willie Ray Thompson on November 19, 1984. Williams was sentenced to a 40-year prison term; Brandon and Jackson were each sentenced to 35-year prison terms. Robert Jackson is not a party to this appeal. On appeal, Brandon and Williams each contend that: (1) he was not proved guilty of murder beyond a reasonable

doubt; and (2) during closing argument, counsel for codefendant Robert Jackson made accusative comments about each of them which denied them a fair trial. Brandon, individually, contends that: (3) the trial court erred in refusing to give an alibi instruction to the jury when he had presented an alibi at trial. Williams, individually, contends that: (4) the trial court erred in allowing the State to introduce evidence that he had attempted to murder John Bates, an eyewitness, while Williams was out on bail; (5) the trial court erred when it allowed the State to impeach the testimony of two of the security guards by use of a police report which contained a summary of the statements made by all three security guards; (6) the State's closing arguments prejudiced Williams; and (7) the testimony of Chicago police detective Gerald Dorich regarding the procedure which he had followed in procuring arrest warrants for defendants violated Williams' right to due process of law. For the following reasons, the judgment of the trial court is affirmed.

The record indicates the following facts which are pertinent to this appeal. Prior to trial, counsel for Brandon and Jackson moved for severance from Williams based on the State's expressed intention to introduce evidence of Williams' attempted murder of John Bates, a key State's witness, while Williams was out on bail. The trial court granted severance. However, before trial commenced, Brandon and Jackson withdrew their motions for severance.

At trial, John Bates testified on behalf of the State that in the early evening on November 19, 1984, he was standing in the lobby of the apartment building located at 1510 W. 13th Street when he heard shouting and shooting outside. He looked out the front door of the building and saw Brandon and Jackson chasing Willie Ray Thompson. The area was well lit and Bates saw that both Brandon and Jackson were armed and were shooting at Thompson.

Bates saw Thompson run by a group of nearby rowhouses, stopping at one and beating on the door, yelling, "Mrs. Crenshaw." After breaking one of the windows in Mrs. Crenshaw's rowhouse, Thompson continued to run toward Roosevelt Avenue until he tripped and fell. Brandon and Jackson then caught up with him and the three struggled.

At that point, Bates saw a car pull up near the three men and saw Williams get out of the car, walk over to Thompson, who was being restrained by Brandon and Jackson, and shoot Thompson in the face at close range. While Brandon and Jackson were still holding Thompson, Williams shook him, then fired additional shots into him at close range. Williams, Brandon and Jackson then entered Williams'

car and drove away. Bates stated that people were all around the area and were looking out their windows. The police arrived a few minutes later, but Bates went home and did not talk to them.

The following day, November 20, 1984, Bates called the police and was told that he had to contact a different headquarters to report the murder. That same day, he called Henry Wright, a friend who had also witnessed the murder. Bates did not call the police again until the following day. At that time, Bates told the police that he had witnessed the murder. The police picked him up and drove him to police headquarters, where he identified photos of Williams, Brandon and Jackson, talked to an assistant State's Attorney and testified in front of the grand jury. On the following day, Bates identified Jackson in a lineup and called Henry Wright from the police station.

Bates then testified as to an incident that had occurred on October 24, 1985, while Williams had been out on bail. Prior to this line of questioning, the trial court instructed the jury that the questions and answers regarding the October 24, 1985, incident related to Williams only.

Bates testified that, on that date, he was driving a two-door Cadillac owned by George Williams (no relation to defendant). George Williams was in the front passenger seat. Jimmy Scott was sitting directly behind Bates. They were driving to Scott's mother's house. When Bates pulled up in front of the house, he saw a little red car at the corner and noticed that defendant Williams and another person were inside. Bates drove away, explaining to the others that he had just seen defendant Williams. They told him to circle back. When he did so, defendant Williams was not there. Bates stopped the car, opened his door, and was leaning forward, looking over his right shoulder, to allow Scott to get out of the car, when he saw defendant Williams standing behind the car. Defendant Williams then walked to the side of the car and started firing an automatic weapon. Bates drove directly to the police station and told them what had happened, leaving Scott lying in the street. An officer accompanied them back to the scene. The back window of the Cadillac was shattered, there was a hole in the side window, a dent in the door on the passenger's side, and the Cadillac emblem was off. The emblem was subsequently found in the street at the scene.

On cross-examination, Bates denied that Mrs. Brandon had asked him to sign a statement exculpating her son and he denied having told Mrs. Brandon that her son had had nothing to do with the murder. Bates further stated that he had given the police the names of Brandon, Jackson and Williams, and had described their height and

weight. However, he could not remember if he had given them a description of their clothing.

On redirect, Bates stated that Henry Wright had not wanted to go to the police because he was afraid of defendant Williams. On recross, Bates stated that he had not seen any security guards chasing Brandon and Jackson.

Chicago police officer Lenti then testified on behalf of the State that when he appeared at the murder scene, a crowd of people had formed around the victim, who was lying on his back on the sidewalk in a pool of blood. Lenti attempted to find out what had happened, but no one would say anything except three security guards, who told him that they had seen some men running, but could not provide very much additional information. Lenti stated that the area was well lit.

Chicago police officer John Thomas also testified that no one in the crowd would provide any information regarding the shooting except some security guards. However, the police did know that they were looking for one to three offenders.

Dr. Yuksel Konacki, Cook County medical examiner, testified that while performing the autopsy on the victim, he recovered two recent bullets from the head and one old bullet from the hip. The wounds to the head were from close range.

Ella May Crenshaw further testified on behalf of the State that at approximately 11 p.m. on November 19, 1984, she was sitting in her bedroom when she heard someone calling her name. Just as she got up to look, someone broke her windows and she heard shots. She then fell to the floor and stayed there until she eventually crawled into the living room.

Chicago police detective Gerald Dorich testified that on November 21, 1984, he received a telephone call from Bates, after which he picked up Bates and drove him to police headquarters to be interviewed. At headquarters, Bates identified a photo of Williams as the person he had seen shoot the victim and also identified photos of Brandon and Jackson. At that time, Bates also gave Dorich the name of Henry Wright as someone to contact regarding the murder. The felony review officer then interviewed Bates and took him before the grand jury. On November 22, 1984, Jackson was arrested and Bates identified him in a lineup. Williams and Brandon were arrested on November 24, 1984.

Next, Herman Mollison testified on behalf of the State that on November 19, 1984, approximately 10:30 p.m., he was walking with Jeff Bradford and Thompson when they encountered Jackson. Jackson told them that he wanted to talk and pulled out a gun. Mollison

and Bradford ran separately in a westerly direction while Thompson ran in an easterly direction. Jackson ran after Thompson. Mollison then heard several shots. When Mollison and Bradford eventually met up with each other, they returned to the area where they had been confronted by Jackson and saw Thompson lying on the ground.

On cross-examination, Mollison stated that he had been subpoenaed to appear at trial by counsel for defendant Williams; that he had not seen Brandon or Bates that night; and that he did not go to the police immediately because he was afraid of Williams.

Next, Henry Wright, confined to a wheelchair as the result of having been shot, testified on behalf of the State that on November 19, 1984, approximately 11 p.m., he was walking to a nearby liquor store when he saw Brandon standing in a fire lane. He heard some shots and ducked behind a car. When he looked up, he saw Jackson and Brandon chasing Thompson. While Jackson was shooting at Thompson, Brandon attempted to cut Thompson off by running across the street. Thompson then ran to Mrs. Crenshaw's house, pounded on the door and broke one of her windows. When Brandon and Jackson caught up with the victim, they took him to the alley. At that point, a small car came down the street and stopped. Williams got out, walked across the street toward Jackson, Brandon and Thompson, and fired a gun at close range in Thompson's face. Williams then bent down, shook the victim, and fired twice more. Jackson, Brandon and Williams then walked toward the car, got in and drove away. After viewing the incident, Wright went home and did not talk to anybody until he received a call from Bates. On November 22, 1984, Wright went to police headquarters where he identified Jackson.

On cross-examination, Wright stated that he believed that he had been shot as the result of his involvement with this case and that he was afraid of Williams. Wright further stated that he had not seen any security guards that night.

Following the State's case in chief, the defendants' individual motions for directed verdict were denied. Next, Yvonne Moore and Alex Moore, husband and wife, testified on behalf of Brandon that on November 19, 1984, Brandon dropped off his wife and son at their house at approximately 6 p.m. and returned to pick them up at approximately 10:10 p.m. At that time, Brandon told them that they could not stay any longer because they had to pick up his mother at work.

Angela Brandon, Brandon's wife, substantiated the Moores' testimony and added that they had picked up Brandon's mother at approximately 10:50 p.m. that night and were home by 11 p.m. Brandon then went to bed and did not leave the house for the rest of the night.

Next, Lily Brandon, Brandon's mother, testified as to the same chronology of events for the late evening of November 19, 1984, adding that in mid-February, Bates had called her and they later met at a restaurant with Sam Busch. Bates then allegedly told Lily Brandon that her son had not been at the murder scene. On cross-examination, Lily Brandon denied having arranged the meeting and denied ever offering Bates $5,000 not to testify against her son.

Sam Busch testified that Brandon's mother had asked him to contact Bates for her. The three of them met at a restaurant, and Bates told Lily that he had not really seen her son at the murder scene. On cross-examination, Busch stated that he had not heard Lily offer any money to Bates and that Bates said he had lied to the police because he had been under a lot of pressure from his girl friend. Busch further stated that on April 10, Bates had sent Busch to see a State's Attorney to retract Bates' statements. However, he did not remember that State's Attorney's name.

Next, Gregory Lewis, Herman Smith and Curly Manon, security guards who had been working in the area of the murder on the 4 p.m. to 12 p.m. shift on November 19, 1984, testified on behalf of defendants. Lewis stated that the guards were working together that night, and at approximately 11 p.m., they were checking vacant apartments on the twelfth floor of the building at 1433 W. 13th Street when they looked out of one of the windows and saw one man approach a group of three others on the ground below. Lewis testified that when the man approached the group, the three dispersed in different directions. He then heard a shot, and he and Smith ran down the stairwell and went outside. Once outside, they saw the victim and another person running toward a group of rowhouses. The victim beat on the window of one of the rowhouses, ran a little farther and either slipped or was knocked down. Lewis then heard another shot, saw a person run across the street and get into a car. Lewis and Smith walked over to where the victim was lying. Lewis did not see anyone else in the area while the incident was taking place.

Herman Smith, one of the security guards, testified to the same observation out of the twelfth-floor window. Smith ran down the stairwell with Lewis and saw one man chasing another near the rowhouses. One of the men broke a window. Smith then heard a shot, one man fell, and the other got into a car. There were not a lot of people in the area before the shooting, but there were after it was over.

As alibi testimony for Williams, Ann Wilson, office manager for the Seville Motel, identified a motel registration card in the name of

defendant Williams, dated November 19, 1984, and time-stamped 11:23 p.m.

After the close of evidence, an instructions conference was held at which counsel for Williams requested that an instruction regarding alibi evidence be given to the jury. The State objected on the ground that, "I.P.I. recommends that no instruction on alibi be given." The trial court found that the instruction would thoroughly confuse the jury and sustained the State's objection. Following closing arguments and deliberations, the jury found all three defendants guilty of the murder of Thompson. A hearing in aggravation and mitigation was then held, after which the trial court sentenced Williams to a prison term of 40 years and Brandon and Jackson to prison terms of 35 years each. This timely appeal of Williams and Brandon followed.

Initially, both Brandon and Williams contend that the State failed to prove them guilty of murder beyond a reasonable doubt. The principal argument made by Brandon and the sole argument made by Williams regarding the reasonable doubt issue is that the State's witnesses were not credible. Specifically, Williams argues that Bates' and Wright's delay in coming forward to discuss the crime with the police demonstrates their motive to fabricate and constitutes impeachment; that Bates' three-way telephone conversation with Wright and Officer Dorich demonstrates "belated collaboration"; that Bates and Wright gave two different street numbers for the exact location of the murder; that Bates stated Brandon and Jackson had struggled with the victim when they caught him, while Wright stated that Jackson and Brandon had dragged the victim to the alley; that Bates could not have seen the murder from his alleged vantage point; that Bates had felony charges pending against him when he went to the police; that Wright perjured himself regarding his prior record and date of birth; and that Williams had an unimpeached alibi.

Brandon's reasonable doubt argument focuses on the descriptions of the assailants given by the State's witnesses to the police. Specifically, Brandon contends that identifying the assailants by name did not constitute sufficient identification. In addition, Brandon argues that Bates' testimony was not reliable or credible.

■ It is axiomatic that it is within the province of the trier of fact to determine the credibility of witnesses and the weight to be accorded to their testimony. On review, mere conflicting evidence does not constitute sufficient grounds for reversal, and a reviewing court will not disturb a verdict of guilty unless the evidence is so improbable that it raises a reasonable doubt as to guilt. *People v. Rader* (1988), 178 Ill. App. 3d 453, 532 N.E.2d 1365.

The only legal authority cited by Williams regarding the reasonable doubt issue is *People v. Coulson* (1958), 13 Ill. 2d 290, 149 N.E.2d 96, which he cites as support for his general introductory statement that when the State's evidence "violates the laws of human experience," the conviction should be reversed. In our view, Williams' argument is insufficient to demonstrate that the evidence was so improbable as to raise a reasonable doubt as to his guilt.

■ Brandon's contention that the identification of the assailants by name was insufficient is equally unpersuasive. A person's name is one of the most objective and informative methods of identification available. Brandon argues that anyone can give a name, suggesting that not anyone could give a physical description of another person he wanted to wrongfully implicate. Obviously, if the witness knew a person by name, he would know what that person looked like. Thus, if he were going to fabricate the name, he could just as easily fabricate the description. Not only is Brandon's argument illogical, it is not supported by the record. Officer Gerald Dorich testified that Bates had given him a height and weight description of the defendants and that he had not asked Bates for a clothing description. Further, Bates had identified the defendants from a photo array and had identified defendant Jackson in a lineup.

The cases relied upon by Brandon as support for his contention that the identifications were insufficient are factually distinguishable and, therefore, unpersuasive. (*People v. Kilgore* (1974), 59 Ill. 2d 173, 319 N.E.2d 489 (three different descriptions of perpetrator); *People v. Gardner* (1966), 35 Ill. 2d 564, 221 N.E.2d 232 (inconsistencies in victim's identification of perpetrator given after arrest and at trial); *People v. Carroll* (1970), 119 Ill. App. 2d 314, 256 N.E.2d 153 (inconsistent, vague and varying descriptions of perpetrator).) In the present case, there was no evidence of hesitation or inconsistency in either Bates' or Wright's identification of the defendants.

Finally, Brandon's contention that his alibi evidence was disregarded at trial is not supported by the record. The evidence was submitted to the jury and was considered in conjunction with all of the other evidence. Accordingly, we do not find the evidence presented against Williams or Brandon so improbable as to raise a reasonable doubt as to the guilt of either defendant.

Williams further argues that the trial court erred in allowing the State to introduce Bates' testimony stating that Williams had attempted to murder John Bates, an eyewitness, while Williams was out on bail. Williams claims that Bates' testimony was unbelievable because it failed to demonstrate that he had committed the offense of

attempted murder and to show that the probative value of the evidence outweighed the prejudicial effect.

During direct examination of Bates, the State queried him as to the alleged attempted murder. Prior to this line of questioning, the court informed the jury that the questions and answers now elicited related to defendant Williams only. John Bates then testified that on October 24, 1985, in the early evening, he was driving George Williams' two-door car with George Williams and Jimmy Scott as passengers. They were on their way to Scott's mother's house. When Bates pulled up to the building where Scott's mother lived, he noticed defendant Williams and another person sitting in a small red car on the corner. Bates drove away and then came back. When he saw that the small red car was gone, he stopped the car and opened the driver's door to let Scott, who was sitting in the back seat, get out. When Scott started to get out, defendant Williams came up and started shooting at them with an automatic weapon. Bates drove off, leaving Scott lying on the ground. Bates drove immediately to a police station, told them what had happened and went back to the scene with the police.

Detective Gerald Dorich also testified as to the events on October 24, 1985. Prior to Dorich's testimony regarding that evening, the court again advised the jury that the testimony as to events of October 24, 1985, was limited to defendant Williams. Dorich testified that at approximately 9:30 p.m. on October 24, he was assigned to investigate an aggravated battery and proceeded to the police station on Racine. When he arrived at the station, Dorich observed a damaged Cadillac parked in front. After interviewing Bates and George Williams, Dorich took them to the scene of the incident and to Cabrini Hospital, where he interviewed Jimmy Scott. The following day, Dorich went to the felony review office, conferred with an assistant State's Attorney and testified in front of the grand jury. Dorich started to explain that he then brought Bates and Jimmy Scott somewhere, but was interrupted by a request for a sidebar by Williams' counsel. During the sidebar, Williams' counsel argued:

"Judge, *** we object to all this testimony *** about the October event. They're trying this case. It was supposed to come in by Bates to show knowledge. Now he's gone to the Grand Jury, he's gone to talk to the state's attorney.

* * *

What I'm asking to you [sic] do now with respect to the October events is to stop it here. There is no need to go any further. Bates came in[,] said he shot at him, the officer says he

interviewed Bates, he interviewed the other 2 victims. That's enough otherwise the other prejudicial effect ***."
The State agreed and asked no further questions about the October 24, 1985, incident.

■ As a general rule, evidence of other crimes committed by a defendant is inadmissible unless that evidence is relevant for a purpose other than to show propensity to commit a crime (*People v. McDonald* (1975), 62 Ill. 2d 448, 343 N.E.2d 489) and its probative value is not outweighed by its prejudicial effect. (*People v. Woods* (1984), 122 Ill. App. 3d 176, 460 N.E.2d 880.) For example, evidence that defendant attempted to kill an eyewitness is relevant and is therefore admissible on the ground that it shows guilty knowledge or a consciousness of guilt. However, the attempt must be connected to defendant. Because defendant is not on trial for the attempted murder, the State need not establish this connection beyond a reasonable doubt. *People v. Baptist* (1979), 76 Ill. 2d 19, 389 N.E.2d 1200.

■ Williams contends that the State has failed to prove that he committed the crime of attempted murder on October 24, 1985, specifically noting that neither Jimmy Scott nor George Williams was brought forward to testify. In our view, Bates' testimony, substantially corroborated by the testimony of Detective Dorich, provides the requisite nexus to connect defendant to the attempted murder of Bates on October 24. In fact, at trial, counsel for Williams stated that "there [was] no need [for Dorich] to go any further" in his testimony regarding the October 24 incident, adding, "That's enough otherwise the other prejudicial effect ***." Williams cannot request the trial court to discontinue a line of questioning by the State connecting him to the attempted murder and then claim on appeal that there was insufficient evidence at trial to connect him. We conclude that the connection established by the testimony of Bates and Detective Dorich provided a sufficient connection to render the evidence admissible to show Williams' guilty knowledge or consciousness of guilt.

■ Regarding Williams' contention that the prejudicial effect of this evidence outweighed the probative value, as stated, the trial court is afforded considerable latitude in deciding whether to admit evidence of other crimes. (*People v. Woods* (1984), 122 Ill. App. 3d 176, 460 N.E.2d 880.) Clearly, evidence as to Williams' attempted murder of the State's key witness in a forthcoming trial in which Williams was the defendant had considerable probative value. Further, any prejudice to Williams was substantially reduced by the trial court's instruction to the jury that the evidence as to the attempted murder was limited to the issue of Williams' identification or knowl-

edge. (*People v. Woods* (1984), 122 Ill. App. 3d 176, 460 N.E.2d 880.) Therefore, the trial court did not err in admitting the evidence as to the offense of attempted murder.

Next, Williams argues that the trial court erred when it allowed the State to impeach the testimony of two of the security guards by use of a police report which contained a summary of the statements made by all three security guards. Williams contends that the State violated his right to a fair trial when, during cross-examination of two of the security guards, the State insinuated that the security guards had told a different version of the event to the police on the night of the incident than they testified to at trial. Williams argues that this insinuation had no support in the record because the police reports were a summary of the testimony of all three security guards and could not be specifically attributable to any one of them.

In response, the State argues that the police report was never specifically referred to at trial and that the impeachment was perfected through the testimony of Chicago police officer Lenti, who testified that the three security guards had told him that they were on the twelfth floor of the 1440 W. 13th Street building when they heard the shot and saw one man chasing the victim and that they lost sight of the chase when they ran downstairs.

■ Where the State's case is grounded on eyewitness identification, a witness' description, as reported to the police shortly after the incident, is relevant if it contradicts the testimony at trial. However, the police report is not competent for impeachment purposes if it is an amalgam of statements by two or more persons and specific statements cannot be attributable to specific witnesses. *People v. Colon* (1974), 20 Ill. App. 3d 858, 314 N.E.2d 664.

In the present case, during cross-examination of security guard Gregory Lewis, Lewis stated that he did not recall telling police officers that he had been on the twelfth floor of the 1440 building, but did recall telling them that while he was looking out the window on the twelfth floor, he had seen a group of men being approached by a single male, and then the group dispersed. He then saw the offender chase the victim to 1223 S. Laflin. Lewis stated that he did not remember telling the officer that he had lost sight of the incident when he ran down the stairs of the 12-story building, although he admitted at trial that he had lost sight after the victim reached 1223 S. Laflin. Lewis also did not recall telling the detectives that, as he saw the group of three men crossing the field, another man had exited the building that Lewis was in and had approached the group. Nor did Lewis recall telling the police that the victim had slipped on the snow,

fallen down and been caught by the offender, after which one shot was fired.

With respect to security guard Curly Manon, Manon stated on cross-examination that initially he had told the police that while he was hurrying down the 12 flights of stairs, he lost sight of the victim. Later that evening, he told an investigator that he had seen a car and had seen the victim get shot. He did not tell that to the police officers who were initially at the scene because the security guards were "holding the scene" and the police did not ask them too many questions at that point.

■■ In our view, defendant has failed to demonstrate how the testimony on cross-examination of either guard prejudiced him or how the questions could be characterized as "insinuations." Even if this line of questioning could be deemed inappropriate, unlike *People v. Nuccio* (1969), 43 Ill. 2d 375, 253 N.E.2d 353, relied upon by defendant, any alleged contradictions between the statements the guards had made to the police and their testimony at trial were clarified by the rebuttal testimony of the police officer.

Next, in reliance on *People v. Blissitt* (1973), 12 Ill. App. 3d 551, 299 N.E.2d 562, and *People v. Turner* (1984), 127 Ill. App. 3d 784, 469 N.E.2d 368, Williams further argues that the testimony of Detective Dorich placed an "imprimatur of guilt" upon Williams by stating that the assistant State's Attorney had "approved the charge of murder" and that Judge Sophia Hall had signed the warrants. The specific testimony to which Williams objects is as follows:

> "[STATE:] What was done after John Bates went to the Grand Jury?
>
> [DORICH:] [Assistant State's Attorney] Susan Fleming then approved for presentation to the Judge 3 warrants.
>
> [STATE:] What were those warrants for?
>
> [DORICH:] Each warrant was for murder.
>
> [STATE:] Who?
>
> [DORICH:] Michael Williams, John Brandon and Robert Jackson.
>
> [STATE:] After those warrants were prepared, what happened?
>
> [DORICH:] I took John Bates myself down to Judge Sophia A. Hall's courtroom and we both appeared before Judge Sophia Hall, she interviewed and talked to both of us and she signed or approved the warrant."

■ In response, the State initially contends that Williams has waived this issue for review by failing to object to specific testimony

at trial or to raise the alleged error in the post-trial motion. (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124; *People v. Thomas* (1983), 116 Ill. App. 3d 216, 452 N.E.2d 77.) We agree with the State. However, even if the issue had not been waived, we find Williams' argument unpersuasive as the authority on which he relies, *People v. Blissitt* (1973), 12 Ill. App. 3d 551, 299 N.E.2d 562, and *People v. Turner* (1984), 127 Ill. App. 3d 784, 469 N.E.2d 368, does not support his contention.

In both *Blissitt* and *Turner*, a prosecutor testified at trial that he had recommended that charges be placed against the respective defendant. The *Blissitt* court held that the testimony was improper and constituted prejudicial error on the ground that it was tantamount to a trial prosecutor offering his belief of a defendant's guilt to a jury. The *Turner* court found the prejudicial impact of the prosecutor's testimony in its case to have been even greater than that in *Blissitt* because the prosecutor testified that he had spoken to the police, to several witnesses and to defendant, plus he had waited for the medical examiner to release the results of an autopsy on the victim prior to recommending charges. Both the *Blissitt* court and the *Turner* court remanded its case for a new trial.

By contrast, in the present case, a prosecutor did not testify. Instead, Detective Dorich set forth the steps he had taken to procure arrest warrants. Further, Dorich never stated that either the assistant State's Attorney or the judge had recommended the charges. They merely approved the charges, a requisite step to procuring arrest warrants in any case. Therefore, Dorich's testimony did not prejudice Williams.

Next, Brandon and Williams each contend that the actions of counsel for Jackson prejudiced them and thereby denied them a fair trial. Williams argues that the cross-examination of State witnesses Herman Mollison and Henry Wright by counsel for Jackson, plus his closing argument, introduced an antagonistic defense to the trial which deprived Williams of his right to due process. Herman Mollison testified on behalf of the State that Jackson, while armed, had chased the victim. On cross-examination of Mollison, counsel for Jackson asked how long Mollison had known Williams and whether he had talked to Williams' counsel prior to trial. Williams claims this was prejudicial.

Later, during cross-examination of Henry Wright, who was confined to a wheelchair after having been shot, counsel for Jackson elicited information that Wright had not gone to the police because he was afraid of Williams and thought the fact that he had been shot

was related to this case. Finally, during closing argument, counsel for Jackson made several direct references to Williams as the shooter. Although counsel for Williams objected numerous times and the trial court directed counsel for Jackson to refrain from that line of argument, counsel for Jackson continued his direct accusations that Williams had been the sole shooter. Counsel for Williams moved twice for a mistrial. The trial court denied the motions. Later, outside the presence of the jury, the following colloquy ensued:

"THE COURT: We have been here for two weeks—so there is a law clerk who may be reviewing the case, if they get to that, if that should be the case, are welcomed to know that we have spent two weeks of long days hearing this case.

\* \* \*

[DEFENSE COUNSEL]: I vigorously disagree with the Court's ruling concerning the two-week trial period. I don't care if it were two months. This man is on trial for murder.

THE COURT: You disagree that we were on trial for two weeks?

[DEFENSE COUNSEL]: I disagree that that should be the reason not to grant a mistrial.

THE COURT: Oh, but it does. It is not a single reason. It is not overriding reason.

[DEFENSE COUNSEL]: I don't think we should talk practicalities, Judge, when a man is on trial for murder.

THE COURT: We have to talk practicalities for those who have never experienced practicalities in the Appellate Division. And we are, the jurors, the State's facilities, the courtroom, all the personnel, we are all seriously engaged in this litigation. And it is not going to be brushed aside.

Mr. Adam has yet to argue and may clarify anything he wants to clarify. So, we will get to that right away."

Thereafter, in the presence of the jury, the trial court further stated:

"The Court wishes to advise the Jury that it is not for one Defendant to cast aspersions upon another. And insofar as Mr. King's argument contained aspersions cast by one Defense position upon another, that part of his argument, the Jury is instructed to disregard."

The State presents several alternative arguments in response to Williams' claim of prejudice. First, the State argues that the comments made by counsel for Jackson during closing argument were invited by the fact that Williams' counsel had subpoenaed State witness Mollison to trial and had talked to Mollison several times prior to

trial. Alternatively, the State agrees that Jackson's closing argument was antagonistic toward Williams, but claims that any resulting prejudice to Williams was minor and, thus, harmless error. Further, the State contends that the instructions to the jury that closing arguments are not to be considered as evidence cured any possible error.

To the extent that they rely on legal authority at all, both Williams and the State rely on cases that address the issue as to whether the trial court erred in denying codefendants' motions for severance. Williams relies on *People v. Bean* (1985), 109 Ill. 2d 80, 485 N.E.2d 349, *People v. Fort* (1986), 147 Ill. App. 3d 14, 497 N.E.2d 416, and *People v. Gibons* (1986), 149 Ill. App. 3d 37, 500 N.E.2d 517. The State relies on *People v. Olinger* (1986), 112 Ill. 2d 324, 493 N.E.2d 579.

■ The issue of whether severance was properly denied is not before this court. As previously stated, prior to trial, the trial court had granted the motions of Jackson and Brandon to sever their trial from that of Williams, predicated on the State's intention to introduce evidence from John Bates that Williams had attempted to murder him while Williams was out on bail for the offense being tried. Subsequently, Jackson and Brandon waived severance. At no other time prior to trial or during trial did any defendant move for severance from any other defendant. The only motions that were made with respect to comments made by counsel for Jackson were motions for mistrial by counsel for Williams. Yet, on appeal, neither defendant argues that the trial court erred in denying a mistrial on the grounds that the comments by counsel for Jackson were prejudicial. These issues are dependent on principles of law distinct from severance.

Although the comments made by counsel for Jackson may have been improper, in light of the jury's verdict against all three defendants, the trial court's instruction to the jury that it should disregard the comments made by counsel for Jackson during closing argument and Williams' subsequent opportunity to rebut any of the comments, we conclude that any possible error was harmless and does not provide grounds for reversal. *People v. Sawczenco* (1989), 180 Ill. App. 3d 406, 535 N.E.2d 1105.

Regarding Brandon's related contention that remarks made by Jackson's counsel deprived him of a fair trial, Brandon argues that Jackson's counsel improperly devoted the majority of his closing argument to placing blame for the murder on Williams, thereby assuming the role of a third prosecutor. Although Brandon admits that counsel's comments did not directly accuse him, he contends that the comments "implied that there has been some sort of collusion between

the defense counsel" and that Brandon had been caught in the "crossfire."

In our view, Brandon is inappropriately attempting to bootstrap himself to Williams' argument. Brandon's contention is grounded in mere conjecture and supported by case law that is factually inapposite and, therefore, unpersuasive. In each of the cases cited by Brandon, *United States v. Gonzalez* (11th Cir. 1986), 804 F.2d 691, *United States v. Romanello* (5th Cir. 1984), 726 F.2d 173, and *People v. Bean* (1985), 109 Ill. 2d 80, 485 N.E.2d 349, the reviewing court addressed the issue of whether the trial court had properly denied the respective defendant's motions for severance which had been made throughout trial. That situation is not present in this case. As previously stated, severance was granted and then waived by Brandon and Jackson. No further motion for severance was made. Williams and Brandon cannot now try to circumvent this decision by claiming prejudice by a codefendant's closing argument.

Next, Brandon argues that the trial court erred in refusing to give an alibi instruction to the jury when Brandon had presented an alibi at trial. Brandon acknowledges that the committee on instructions in Illinois has taken the general view that alibi instructions only serve to confuse the jury as to the burden of proof. However, Brandon contends that refusing to give jury instructions for this reason insults the intelligence of the jury members and denies defendant a fair trial. Further, Brandon argues that the trial court's failure to give the alibi instruction was "most likely inferred" by the jury as a comment by the trial court that it did not find the alibi evidence to be credible. In response, the State argues that the trial court properly refused to give the instruction on the grounds that proof of an alibi is not an affirmative defense and the committee note to Illinois Pattern Jury Instructions, Criminal, No. 24—25.05 (2d ed. 1981) (IPI) recommends that no instruction on alibi evidence be given.

During the jury instruction conference, counsel for Williams introduced an alibi instruction. When asked by the trial court where he got the instruction, counsel for Williams replied that most of it had been taken from Illinois Revised Statutes. The State objected and stated that the IPI recommends that no alibi instruction be given. Counsel for Williams argued that because an alibi is an affirmative defense, the State must disprove it beyond a reasonable doubt just like any other affirmative defense.

In response, the trial court noted that the instruction was thoroughly confusing and that "[i]t would take [the jury] three days to figure this out, and in that it would not be helpful." The trial court then

sustained the State's objection. When counsel for Williams inquired whether the trial court could think of another instruction, the trial court replied that if the people that write and rewrite jury instructions abandoned the old alibi instruction and recommended that none be given, then no alibi instruction should be given. As a result, the instruction was refused as to Williams and as to Brandon.

The instruction presented and refused was the following:

"The defendants Brandon and Williams have offered evidence of an alibi in their defense. Alibi means the defendant(s) claim they were somewhere other than at the scene of the murder when it is alleged to have been committed. The defense of an alibi is an affirmative defense. Under the law, 'affirmative defense' means that unless the State's evidence raises the issue involving the alleged defense, the defendant, to raise the issue, must present some evidence thereon. If the issue involved in an affirmative defense is raised, then the State must sustain the burden of proving the defendant guilty beyond a reasonable doubt as to that issue together with all the other elements of the offense."

■■ In support of his argument that the trial court erred in denying the alibi instruction, Brandon relies on several cases outside of our jurisdiction and on *People v. Scott* (1948), 401 Ill. 80, 81 N.E.2d 426. None of these cases reflect current Illinois law. Although the *Scott* court specifically held that the trial court's refusal to instruct the jury on the theory of alibi testimony constituted reversible error, Illinois law has changed subsequent to *Scott*. In *People v. Pearson* (1960), 19 Ill. 2d 609, 169 N.E.2d 252, the supreme court held that an alibi is not an affirmative defense. Rather, it is a method of countering the prosecution's case. Similarly, in *People v. Poe* (1971), 48 Ill. 2d 506, 272 N.E.2d 28, the supreme court held that the trial court had not erred in refusing to give defendant's alibi instructions. In reaching its decision, the *Poe* court relied on the committee comments to IPI Criminal No. 24.05, which recommend that no alibi instruction be given on the ground that instructions should not comment on particular types of evidence. See also *People v. Rivera* (1979), 72 Ill. App. 3d 1027, 390 N.E.2d 1259.

Williams further contends that the cumulative impact of prosecutor misconduct during the trial violated his right to due process and requires reversal of his conviction and remand for a new trial. Specifically, Williams claims that the State's two overriding prosecutor themes during closing argument were not supported by the evidence: (1) Williams engendered fear in the neighborhood which prevented

witnesses to the murder from stepping forward; and (2) the murder was a planned execution designed to perpetuate that fear. In addition, Williams contends that the State erroneously commented that the defense had intentionally withheld evidence regarding the victim's relationship with Williams so as to conceal motive and that the victim had been murdered by two different shooters.

 █ As a prerequisite to raising any issues on review, Illinois law requires that timely objections have been made to the alleged error during trial and that the alleged errors be included in the post-trial motion. (*People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856; *People v. Thomas* (1983), 116 Ill. App. 3d 216, 452 N.E.2d 77.) It is well recognized that a prosecutor has wide latitude during closing argument and that the determination as to the propriety of the comments is within the trial court's discretion and will not be reversed on appeal absent a showing of abuse of discretion or substantial prejudice to defendant. (*People v. Neumann* (1986), 148 Ill. App. 3d 362, 499 N.E.2d 487.) In closing argument, the prosecutor may properly comment on the evidence presented or reasonable inferences drawn from that evidence; respond to comments made by defense counsel which clearly invite response; comment on the credibility of witnesses; denounce the defendant's activities; and demand that justice be served. *People v. Rader* (1988), 178 Ill. App. 3d 453, 532 N.E.2d 1365.

██ In the present case, Williams has waived the issues regarding the State's comments that the victim's murder was part of a plan and that the victim had been killed by two shooters by failing to object to these remarks during closing argument and by failing to allege these errors in his post-trial motion. *People v. Thomas* (1983), 116 Ill. App. 3d 216, 452 N.E.2d 77.

██ With respect to the State's comments that Williams engendered fear in the neighborhood and that neighbors were afraid to testify against him, the record indicates that these were comments on the testimony. At trial, John Bates and Henry Wright testified that their reluctance to go to the police with information as to Williams' involvement in the murder was predicated on their fear of Williams. In fact, Wright specifically stated that he feared Williams and the others would do to him what they had done to the victim. In addition, Herman Mollison indicated that he had not gone to the police because he was afraid. Regarding the State's comment that had John Bates been allowed to testify as to the relationship between Williams and the victim, the motive for the murder would have been clear, this comment was invited by defense counsel's earlier comment during closing argument that not even John Bates could supply a motive. For

these reasons, the State's comments during closing argument do not provide grounds for reversing Williams' conviction.

For the aforementioned reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

BUCKLEY, P.J., and O'CONNOR, J., concur.