THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
LEROY FINLEY, Defendant-Appellant.

First District (2nd Division)   No. 1—89—2215

Opinion filed November 26, 1991.—Rehearing denied January 7, 1992.

Michael J. Pelletier, of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Carol L. Gaines, and Joseph W. Colaianne, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE SCARIANO delivered the opinion of the court:

Leroy Finley appeals from his conviction by a jury of the armed robbery of Kevin Anderson, claiming that he was denied a fair trial because of statements made by the prosecution and certain testimony that the State's Attorney's office had approved the case against him; that the State had engaged in racial discrimination in exercising its peremptory challenges during jury selection; and that the court improperly refused to appoint independent counsel to represent him in his post-trial motion, in which he charged his trial counsel with ineffective assistance. Finley seeks reversal of his conviction with a remand for a new trial, reversal with a remand for a hearing on his racial-discrimination claim or reversal with a remand for a hearing, while represented by independent counsel, on his claim of ineffective trial counsel.

During *voir dire*, the State exercised peremptory challenges to exclude veniremembers Kevin English, SanFeur Martin and Vincent Williams. Finley moved for a mistrial, "based upon the State using all their challenges against black people, systematically excluding every black. All of these people are employed, just like the other whites they did not exclude ***." The court noted that after the State's challenges, the jury consisted of "four black males, five white males, two white females, and one male of Indian descent, Middle East, I think." Finley renewed his objection, citing the State's use of all three of its challenges against black veniremembers.

The State responded by pointing out that it still had "four remaining challenges, and there are four blacks remaining on the jury." The prosecutor then explained why he had excluded the three black veniremembers, after which the trial judge stated:

"I do not believe that the defendant has made a *prima facie* case. The state does have four remaining challenges. If there was systematic exclusion of black people, the State had four remaining challenges they could have challenged the other four remaining jurors, which constitute twenty-five percent of the jury, which fairly represents the community as a whole, the black population constituting twenty to twenty-five percent of the county's population.

Lastly, even though unnecessary, the State has in fact set forth its reasoning for the *** challenge to these jurors ***."

The court then discussed the State's proffered reasons for its exclusion of the three veniremembers, and finding that the reasons were sufficient to justify the challenges, denied Finley's motion.

Anderson testified at trial that he was working at the Little Miss Muffet "all-girl review" or "strip joint" at about 2:20 p.m. on September 11, 1988, when Finley and another man entered the establishment. Finley asked about the cost of watching the strip show, and when Anderson responded, Finley "pulled out two guns and said 'put your hands on the counter.' " He ordered Anderson not to move his hands, came around the counter behind which Anderson was standing and asked him "where the money was." Anderson replied that the money was "underneath the counter *** on the shelf." Finley took the money, approximately $120, and also took approximately $30 from Anderson's wallet. During the episode, Finley's companion also held a gun.

Finley proceeded to the back of the store, but Anderson could not determine what he did there; the other man continued to cover Anderson with his gun. When Finley returned about a minute later, his partner gave Finley some handcuffs and told him to cuff Anderson to a chair. Finley complied. He then "rousted" two customers from the back of the store. One man, who was "sort of crippled[,]" was "set *** down. They didn't do anything at all to him. *** [T]he other guy they laid on the floor and took his money." The two assailants then left.

The State and Finley later stipulated that during the preliminary hearing, Anderson testified that Finley "[c]ame back out and rousted a couple of customers; emptied out the money from their pockets and then they left."

When the police arrived on the scene, Anderson described his assailants:

> "One was about 220 pounds, six-two, and he had baggie shorts on. The other one had a blue gangster hat and he was about 150, 160 pounds, five-eleven.
>
> * * *
>
> *** The bigger one had a mustache and a grizzly beard."

On September 21, 1988, Anderson identified Finley in a police lineup. He also testified that on September 25, 1988, he received a phone call at the Little Miss Muffet from one who identified himself as and who sounded like Finley. The caller offered Anderson "a thousand dollars not to go to court. He said he would have $500 there today and I told him I'd think about it." Anderson then called Chicago police detective Steven Glynn and related the occurrence to him.

Robert J. Peterson, a patrol officer for the Chicago police department, testified that at about 2:30 p.m. on September 11, 1988, he was dispatched to the Little Miss Muffet to investigate a report of a robbery and of a victim being restrained by handcuffs. When he arrived at the scene, he saw that Anderson's right hand was cuffed to a chair. Anderson gave a description of his two assailants similar to the one he gave at trial.

Arthur Buckley, Chicago police officer, also responded to the call at the Little Miss Muffet. While he was speaking with Anderson about the incident, he found a small folded piece of yellow paper on the floor, and, unfolding it, he saw that it was a traffic citation made out to Finley. Without showing the paper to Anderson, he asked Anderson to describe his assailants; Anderson replied with essentially the same description as that given to Peterson. The citation described Finley as 6 feet 3 inches tall and weighing 182 lbs.

Brian Regan, a Chicago police detective, testified that after searching for Finley at various locations on September 13, 1988, Finley phoned him and asked why Regan was looking for him. He told Regan that he would come to his office the next day, but failed to appear. Regan showed Anderson a group of photographs on September 14, 1988, from which Anderson identified a picture of Finley as that of one of his assailants; he repeated this identification the following day.

Herman Kluth, a fingerprint examiner for the Chicago police department, testified that the only fingerprint taken from the crime scene was lifted from the handcuffs, but that it was not suitable for identification.

Steven Glynn, a Chicago police officer, testified that on September 21, 1988, Anderson identified Finley in a police lineup. After the lineup, Glynn interrogated Finley, who maintained that he had never been to the Little Miss Muffet and that he did not commit the robbery. When asked "How his traffic ticket might have ended up there," Finley replied "that he didn't know *** how it got there."

Glynn recalled that Anderson had called to inform him that a man sounding similar to and identifying himself as Finley had offered $1,000 to him for not coming into court. Glynn did not remember Anderson telling him that Finley had said he would have $500 for Anderson that day. The State and Finley later stipulated that pay phones were not accessible to prisoners at the Cook County jail, in which Finley was incarcerated, but that inmates may make third-party calls.

Finley testified that at the time of the incident he was married, was working for a messenger service and that he had been convicted in 1978 for unlawful use of a weapon, for robbery in 1981 and for theft in 1987. When asked on direct examination, "And directing your attention to September 11, 1988, around two o'clock in the afternoon, did you have the occasion to go anywhere?" he responded that he had gone to the Little Miss Muffet. Six questions later, however, in response to the question, "And about what time did you arrive at the Little Miss Muffet ***?" he replied, "About 12:40."

Finley stated that he had gone to the establishment intending to hire a prostitute, which he had done there before. Upon his arrival, he told Anderson, who was standing behind a glass counter containing various items including handcuffs and other items, that he "wanted a girl." He pulled out $45, which he gave to Anderson, but Anderson told him that the services of a prostitute would cost him $75.

Finley told Anderson that he "always pa[id] $45." Anderson retorted, "[I]f you want a cheap *** whore, go on Madison and get one, stupid-ass nigger." Finley then "called him a name and told him [that he would] beat his *** ass." Anderson then said to Finley, "You better leave before I call the police." Finley then left. He testified that he did not rob Anderson, did not possess a gun at the time he entered the Little Miss Muffet, and that he was not accompanied by any other person.

After learning from his mother, who had been visited by the police, that they were looking for him, Finley called Glynn and was told by him that "he wanted to discuss an incident, a battery." Although Finley told Glynn that he would come in the next day, he failed to do so because, "I got to think that I don't remember no batteries so I

didn't go in." After his arrest, he told Glynn that he "had never been at Little Miss Muffet" because he "didn't want [his] wife to find out about it." On September 25, 1988, the date of the alleged phone call to Anderson, Finley was "in the segregation *** in Cook County Jail" and had no access to a pay phone; he denied making any phone calls on that day.

Finley was convicted of armed robbery and sentenced to 25 years in custody of the Illinois Department of Corrections.

Following his conviction, Finley wrote three letters to the trial judge in which he provided the names of persons who, he claimed, could testify that he was in Ford Heights at the time of the robbery (although he admitted being at the Little Miss Muffet earlier in the day), as well as the name of a medical doctor who had testified for him in a suit against the Department of Corrections, and who could testify again, that he could not use his right hand; accordingly, Finley asserted, he could not have held two guns, as Anderson had testified. Finley also charged that his public defender did not attempt to contact these potential witnesses and that she "did not represent me to the best of her ability."

During the hearing on Finley's post-trial motion, which had been filed by his trial counsel, the circuit court, treating Finley's letters as "a motion for the appointment of other counsel," denied his request, stating that "the allegations of the existence of all alibi witnesses made by the defendant in his letters is totally a contradiction to defendant's sworn testimony at trial." The judge noted further:

> "With regard to the defendant's further allegation of the testimony of a treating physician for an injury to his right hand that would prevent him from holding a gun in that hand. *** I find that is, this allegation is totally unsupported as the other allegation is. Totally unsupported by his own testimony and sworn testimony is totally without merit."

Finley first claims that he was denied a fair trial by the prosecutor's argument and use of testimony to show that the assistant State's Attorney who approved his arrest warrant believed that he was guilty because of an investigation conducted by the felony review unit of the State's Attorney's office, and that he would not have approved the warrant otherwise; thus, the State is alleged to have improperly bolstered Anderson's credibility. The State responds that the argument and testimony "merely described the requisite steps taken to procure the arrest warrant," that "there was no testimony that the prosecutor had recommended charges against the defendant, rather, the prosecutor merely approved the charges, a requisite step towards

procuring an arrest warrant" and that the State "did not *** bolster the credibility of the complainant."

During opening argument, the prosecutor claimed that "Anderson identified the photograph of Leroy Finley. *** [The police then] contacted the State's Attorneys [*sic*] Office of Felony Review." An attorney from that office accompanied the police to an interview with Anderson, during which he again picked out Finley's photograph. The police then "obtained a warrant for his arrest."

At trial, Detective Regan testified that on September 15, 1988, after Anderson identified Finley's photograph as that of one of his assailants, he "notified the Felony Review State's Attorneys [*sic*] Office." Felony review, he explained, "is a unit comprised of State's Attorneys and they are there for the purpose of approving felony charges and warrants when they're sought by the police department." Over Finley's objection, Regan stated that before the felony review unit approves such charges or warrants, "[t]hey must review all the facts and interview all the parties that are available." Regan stated that he accompanied an assistant State's Attorney to "interview[] Mr. Anderson and Mr. Anderson also looked at the photographs again and picked out *** Finley's photographs." After that identification, the assistant State's Attorney "approved *** an arrest warrant for *** Finley."

During closing argument, the prosecutor stated:

"[T]hey decide it is time for an arrest warrant, that this man is not coming in. He has been positively identified and has not cooperated. He is not showing up. We will get a warrant, and then again Detective Regan explained to you what is necessary to get a warrant. They just can't go out and get a warrant. They have to get approval from the State's Attorney's Office, and that State's Attorney has to again go over the evidence and review the evidence, so that State's Attorney goes and personally talks to Kevin again, and Kevin again—

MS. PANTLE [defense attorney]: Objection.

THE COURT: Overruled.

MS. RIVERA [assistant State's Attorney]: Speaks to Kevin and Kevin tells him what happened. And that State's Attorney says well, I want to see if he can really identify this person.

MS. PANTLE: Objection.

THE COURT: Overruled.

MS. RIVERA: So the photo array is shown to Kevin again for the second time, and again he identifies the defendant. So,

now the warrant is approved. Now, there is a warrant for the arrest of the defendant."

"A prosecutor's testimony that he recommended that charges be placed against a defendant after discussing the facts of the case with the police" (*People v. Turner* (1984), 127 Ill. App. 3d 784, 792), or an assistant State's Attorney's testimony "that her function as a member of the Felony Review Unit *** was to 'determine whether or not the individual should be charged, and if the felony should be charged [to] determine which felon [sic] we should charge'" (*People v. Jones* (1987), 155 Ill. App. 3d 641, 647) is error. It is permissible, however, for a police officer to testify that an assistant State's Attorney "approved the charges" when the officer is "set[ting] forth the steps *** taken to procure arrest warrants" and such approval is "a requisite step to procuring arrest warrants." *People v. Brandon* (1990), 197 Ill. App. 3d 866, 879-80.

Even when, as in the instant case, a prosecutor does not testify, argument "that the assistant State's Attorney, who prepared the complaint against the defendant, would not have submitted it to the court if he did not believe there was culpability" is prohibited, as "[t]he defendant ha[s] the right to be judged by the evidence in court, not by what some prosecutor might have thought of his guilt." (*People v. Adkins* (1973), 16 Ill. App. 3d 394, 396.) Further, it is error for the State to allude to a police officer's testimony "as to the events that led to the arrest of an accused" "as substantive evidence indicating defendant's guilt," when the issue addressed by the argument is not an issue in the case. *People v. Williams* (1987), 159 Ill. App. 3d 612, 619-20.

■ We do not deem the disputed portion of the prosecutor's opening argument to be violative of these rules; it merely stated what events occurred before an arrest warrant was procured; those parts of Regan's testimony and of the closing argument which merely outlined what events led to the procurement of the warrant were similarly proper. (See *Brandon*, 197 Ill. App. 3d at 879-80.) Improper, however, was Regan's testimony that the felony review unit "is *** comprised of State's Attorneys *** for the purpose of approving felony charges and warrants when they're sought by the police department" and that before the State's Attorney's office can approve arrest warrants, "[t]hey must review all the facts and interview all the parties that are available." Also improper was the State's closing argument that, "They just can't go out and get a warrant. They have to get approval from the State's Attorney's Office, and that State's Attorney has to again go over the evidence and review the evidence."

These statements did more than merely outline "the procedures required to obtain an arrest warrant" (*People v. Curtis* (1989), 190 Ill. App. 3d 207, 216).

In *Williams*, the arresting officer testified "that he arrested defendant [found guilty of cruelty to a child] on the basis of information provided by the [victim], his sister and the [arresting] officers and based on his own physical observations [of the victim]." (*Williams*, 159 Ill. App. 3d at 615.) During rebuttal argument, the State said to the jury, "[t]aking into account the picture [of the victim after the beating], taking into account the officer's testimony, take into account the—that when Defendant was finally arrested, by [the officer whose testimony is described above], that he relied on the information and the statements that were presented him by police and by the children." (159 Ill. App. 3d at 619-20.) The court held:

> "It was *** improper for [the officer] to testify that he arrested defendant based on the statements of the children. We recognize that a police officer may properly testify as to the events that led to the arrest of an accused under certain circumstances. [Citation.] However, [the officer's] testimony went beyond what was necessary to describe the investigation and arrest. Probable cause to arrest was not an issue. Furthermore, the prosecutor in his closing rebuttal argument alluded to this testimony as substantive evidence indicating defendant's guilt. Arguing the applicability of evidence beyond the limited purpose for which it is admissible is plain error." 159 Ill. App. 3d at 620.

See also *People v. Okundaye* (1989), 189 Ill. App. 3d 601, 624 (Murray, P.J., and Coccia, J., specially concurring) (prosecutors may not take advantage of the admissibility of evidence of police investigatory techniques in order to infer guilt).

We note that, in the instant case, neither probable cause to arrest Finley, nor Anderson's identification of Finley, was an issue at trial (see *Williams*, 159 Ill. App. 3d at 619-20). For that reason, that part of Regan's testimony set forth above and the above-indicated portion of the State's argument, insofar as they may have implied official approval of Finley's guilt and thus bolstered the State's evidence, were improper. Although we strongly condemn this type of bolstering by the State, we conclude that these errors were not material factors in Finley's conviction and the verdict could not reasonably have been different had they not occurred.

Finley next alleges that the court erred in denying his motion for a mistrial, which was predicated on the State's alleged discriminatory

use of its peremptory challenges during *voir dire*. He argues: (1) that the trial judge improperly accepted the State's explanations for its peremptory challenges in determining that Finley had failed to make a *prima facie* case of discrimination; (2) that the judge improperly considered, in finding that no *prima facie* case had been made, the extent to which the proportion of black people on the jury related to the proportion of black people in the community; (3) that even if the judge's actions were not improper, his determination that no *prima facie* case had been made was erroneous; and (4) that because a *prima facie* case had been made, this cause should be remanded for a hearing to determine the adequacy of the State's explanations for its challenges; but that if the record is complete enough for this court to determine the legal sufficiency of the State's proffered explanations, those explanations should be held to be inadequate and Finley's conviction should be reversed and his cause remanded for a new trial.

■ The State first responds that Finley neither objected to the trial judge's allegedly improper consideration of the State's explanations for its challenges in deciding that Finley had not made a *prima facie* case of discrimination, nor raised the issue in his post-trial motion; accordingly, he has waived review of the issue. We need not review this question, however, nor any others relating to the trial court's finding that Finley had failed to make a *prima facie* case. The trial court, after finding that a *prima facie* case had not been made, went on to find that the prosecutor had articulated permissible reasons for exercising its peremptory challenges against the three venire-members. We hold that when the court made this finding, the issue of whether it had properly determined that no *prima facie* case had been made was rendered moot.

*Batson v. Kentucky* (1986), 476 U.S. 79, 89, 90 L. Ed. 2d 69, 83, 106 S. Ct. 1712, 1719, held that "the Equal Protection Clause [(U.S. Const., amend. XIV, §1)] forbids the prosecutor to challenge potential jurors solely on account of their race," and that if a *prima facie* case of purposeful discrimination is made, the prosecutor is required to articulate a race-neutral explanation for his peremptory challenge. (476 U.S. at 100, 90 L. Ed. 2d at 90, 106 S. Ct. at 1725.) In *Hernandez v. New York* (1991), 500 U.S. 352, 359, 114 L. Ed. 2d 395, 405, 111 S. Ct. 1859, 1866, as in the instant case, "[t]he prosecutor defended his use of peremptory strikes without any prompting or inquiry from the trial court." Although *Hernandez* differed from the instant case in that "the trial court [in *Hernandez*] had no occasion to rule that [defendant] had or had not made a *prima facie* showing of intentional discrimination," while in the instant case the trial court did so rule,

its later finding that the State's proffered reasons for its peremptory challenges were proper, as in *Hernandez*, was a "rul[ing] on the ultimate [issue] of intentional discrimination, [which made] the preliminary issue of whether the defendant had made a *prima facie* showing *** moot." (Emphasis added.) (*Hernandez*, 500 U.S. at 359, 114 L. Ed. 2d at 405, 111 S. Ct. at 1866.) Accordingly, there is no need for this court to review the issue. See also *People v. Johnson* (1991), 218 Ill. App. 3d 967, 979.

The State then argues that its explanations for its challenges were sufficient to rebut the charge of discrimination. With regard to Martin, the prosecutor stated:

> "I would state for the record that I think the record has already indicated Your Honor could not hear any of the woman's responses, nor could the court reporter. Even after Your Honor asked her to speak up, I could not hear anything that she said, Judge. I didn't know her first name. I could not hear a word that the woman said."

In discussing its challenge to Williams, the prosecutor noted:

> "[H]is brother is a convicted felon, and it is my understanding he is still in the penitentiary for attempted murder. I think that he may show some possible sympathy for the defendant in this case, and I don't think anybody else has anybody in the penitentiary, black or white."

The trial judge stated that "with regards to Ms. Martin and Mr. Williams, I find these to be very objective challenges as to both of these people."

Finley argues that the record does not support the State's explanation for its challenge to Martin and that the alleged inaudibility was not reasonably related to her performance as an impartial juror, thus allowing the inference that the State manufactured the explanation and that she was actually excluded because of her race. With regard to the prosecutor's challenge to Williams, Finley points out that Williams' brother had been convicted of a crime eight years earlier, that Williams had stated that the event would not influence him as a juror and that two nonexcluded jurors had themselves been prosecuted for, and one convicted of, a criminal offense. More specifically, Ronald Monroe had five years before been accused of stealing a lottery ticket, but the charge had been dismissed; while Daniel Varanauski had six years earlier been charged with burglary, which was later reduced to a misdemeanor and for which he was placed on probation, a sentence he had completed by the time of Finley's trial.

Finally, the prosecutor explained his peremptory challenge to English by arguing:

> "I noticed right away that he did not stop staring at my partner. I don't know if that is a compliment, or if he knows her, or doesn't know where he knows her from, but we both noticed that. We both felt extremely uneasy with him sitting approximately ten feet from us, as he was less than ten feet during the jury selection ***."

The trial court found that this was "a subjective difference, and they [the prosecutors] are entitled to make that determination under these circumstances." Finley notes that the record fails to disclose any comment on English's demeanor by any other party to the proceeding, that the prosecution did not comment thereon until its motives in challenging the venireman were questioned, and that it made no effort to discern why English was supposedly staring at one of the prosecutors; accordingly, the legitimacy of the State's explanation is called into question.

■ The court in *People v. Harris* (1989), 129 Ill. 2d 123, 174-75, held that a trial court's determination about whether the State has come forward with sufficient reasons to rebut the defendant's *prima facie* case "will only be reversed if against the manifest weight of the evidence." Such reasons are sufficient if they are "clear, reasonably specific, legitimate, and nonracial." (*People v. Hope* (1990), 137 Ill. 2d 430, 467, *vacated on other grounds* (1991), 501 U.S. 1202, 115 L. Ed. 2d 966, 111 S. Ct. 2792.) We hold that the trial court's finding in the instant case does not warrant reversal.

As to veniremember Williams, the trial judge was clearly entitled to find that the reason given by the State for its challenge was "clear, reasonably specific *** and nonracial"; moreover, the factual basis is supported by the record. While it is true that the court in *People v. Harris* (1989), 129 Ill. 2d 123, 180, held that "although it is not conclusive, evidence that a stricken minority venireperson possessed the same characteristics as a nonminority juror on whom the State chose not to exercise a peremptory challenge should certainly be given great weight by the trial court in evaluating the State's explanations," here, neither veniremembers Monroe nor Varanauski had served time in jail. Hence, the trial court was reasonably entitled to accept the State's claim that it feared that Williams could "show some possible sympathy for the defendant in this case."

Turning then to the State's challenge to Martin and English, we are mindful that:

"[E]xplanations which focus upon a venireperson's body language or demeanor must be closely scrutinized because they are subjective and can be easily used by a prosecutor as a pretext for excluding persons on the basis of race." (*Harris*, 129 Ill. 2d at 176.)

Except for the prosecutor's statements, the record nowhere reflects either Martin's inaudibility or English's staring. The trial court, however, was in the best position to judge the credibility of the prosecutor's statements about Martin's and English's demeanor. As noted in *Hernandez*:

"[T]he decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.' " (*Hernandez*, 500 U.S. at 365, 114 L. Ed. 2d at 409, 111 S. Ct. at 1869, quoting *Wainwright v. Witt* (1985), 469 U.S. 412, 428, 83 L. Ed. 2d 841, 854, 105 S. Ct. 844, 854.)

Neither the court nor Finley indicated any quarrel with the facts upon which the State based its exclusion; we therefore find no reason to overturn the trial judge's finding that the State's reason was acceptable. "[T]he prosecutor's explanation need *not* rise to the level of justifying exercise of a challenge for cause," and there is no evidence that the challenges were based on "an assumption that the black members of the venire would be partial to the defendant because of their shared race." (Emphasis in original.) *People v. Talley* (1987), 152 Ill. App. 3d 971, 987 (legitimate to exclude a juror when prosecutor "was not too happy with [the person's] demeanor and how he answered the questions[ ]").

Finley's final claim of error is that his request for independent counsel to represent him on his post-trial motion was not without merit, and that, therefore, the trial court erred in denying that request. The State responds that the bases upon which Finley requested independent counsel were without potential merit, and that the circuit court's determination to that effect was not manifestly erroneous.

The court in *People v. Krankel* (1984), 102 Ill. 2d 181, 187, held that where a defendant makes a *pro se* motion for a new trial on the ground of ineffective assistance of counsel, and where the trial court declines to appoint new counsel to represent the defendant at the post-trial hearing on his claim, the cause should be remanded for a

hearing, at which the defendant is to be represented by newly appointed counsel.

■ Failure by trial counsel to contact witnesses who could possibly have had a serious impact on a case where, as here, the victim and the accused were the only eyewitnesses to the offense could conceivably support an ineffective assistance of counsel claim. (See *People v. Jameson* (1987), 155 Ill. App. 3d 650, 661-63.) Moreover, we disagree with the trial court's finding that what the proffered witnesses could have testified to was inconsistent with Finley's testimony at trial.

Finley does not dispute his presence at the Little Miss Muffet on the day in question; rather, he testified that while he was there, he did not commit the acts with which Anderson charged him. Although Finley's affirmative response to the question, "And directing your attention to September 11, 1988 around two o'clock in the afternoon, did you have the occasion to go anywhere?" buttressed Anderson's claim that the crime occurred at 2:20 p.m., his statement made only a few questions later, in response to a nonleading question, that he "arrive[d] at the Little Miss Muffet" at "[a]bout 12:40" is consistent with his claim that witnesses could testify that he was not in Chicago at the time of the incident. In addition, Finley's allegation that testimony could establish his inability to hold a gun in both hands is "unsupported by his own testimony," as the trial judge noted, because Finley was never asked about his medical condition. In his letters to the judge, Finley named all of the prospective witnesses and described what their testimony would be.

We do not decide whether Finley can successfully argue ineffective assistance of counsel in a post-trial proceeding; instead, we hold that the trial judge did not accord Finley's claim proper consideration since it "ha[s] potential merit" (*People v. Brandon* (1987), 157 Ill. App. 3d 835, 847), and whether he is entitled to be represented by new counsel from other than the public defender's office to argue his claim of incompetence of trial counsel should be determined on remand in light of the supreme court's ruling on the issue in the case of *People v. Banks* (1987), 121 Ill. 2d 36.

Accordingly, we remand this cause for a proper post-trial hearing solely on Finley's allegation of ineffective assistance of counsel, but we affirm the judgment in all other respects. "If, after the hearing, the judge finds that the defendant did not in fact receive effective assistance of counsel based upon counsel's alleged failure to present a valid alibi defense, then he shall order a new trial. If, however, he determines that the defendant received the effective assistance of coun-

sel, he shall deny a new trial and leave standing defendant's conviction and sentence \*\*\*. If the circuit court denies defendant a new trial, defendant can still appeal to the appellate court based on his assertion of ineffective assistance of counsel \*\*\*." *Krankel*, 102 Ill. 2d at 189.

Affirmed in part; reversed in part and remanded.

HARTMAN and DiVITO, JJ., concur.